**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-10985

ARTHUR H WILLIAMS,

Plaintiff-Counter Defendant-Appellant,

v.

CIGNA FINANCIAL ADVISORS INCORPORATED;
CIGNA INDIVIDUAL FINANCIAL SERVICES;

Defendants-Appellees,

CONNECTICUT GENERAL LIFE INSURANCE COMPANY,

Defendant-Counter Claimant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

December 6, 1999

Before POLITZ, WIENER and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Arthur Williams appeals from the district court's judgment
confirming an arbitration panel's award (1) rejecting his claims

against defendants based on age discrimination and retaliation under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621 *et seq.*, and (2) granting defendants' counterclaim against Williams holding him liable for and ordering him to pay $18,945 in satisfaction of his unpaid promissory notes held by one of the defendants.  We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1987, Cigna Financial Advisors, Inc. (Cigna) hired Williams as a Registered Representative (agent) at the age of 58.  As a condition of his employment, Williams registered with the National Association of Securities Dealers (NASD).  In doing so, he signed a Uniform Application For Securities Industry Registration or Transfer (U-4 Form) which provided that "any dispute, claim or controversy that may arise between me and my firm . . . is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register."  In 1993, Williams had the lowest sales of 15 similarly situated agents and owed Cigna $29,613 for advances on future commissions and a loan for the purchase of a computer.

Larry Phillips, Cigna assistant regional vice-president, and James Lasater, Cigna regional vice-president, met with Williams on December 22, 1993.  They informed Williams that, because of his consistently unprofitable performance and growing indebtedness, he could not continue as an active agent, unless he immediately

reduced his debt by $18,000. Otherwise, they said he must become a retired agent. The evidence is in dispute as to whether they offered Williams the option of becoming a broker instead of retiring.[1] Phillips encouraged Williams to sign a form changing his status to retired agent effective January 1, 1994. Phillips stated that if Williams failed to elect one of the options offered, he would be terminated. Williams said he was not willing to retire, and he did not accept any of the options offered. The evidence is in dispute as to whether Williams rejected the offers at that point or simply left the meeting without indicating whether he would accept any of them.

Williams filed a complaint with the Equal Employment Opportunity Commission (EEOC) on January 5, 1994, claiming that he had been discriminated against in violation of the ADEA. In his first complaint, Williams alleged that he was given the options of retiring or resigning during the December 22 meeting with Phillips and Lasater. When Phillips learned of the EEOC complaint he requested a meeting with Williams. Williams met with Phillips on January 12, 1994, in Phillips's office and surreptitiously recorded their conversation. The transcript of this conversation covers some 54 pages. Phillips acknowledged that the transcript

---

[1]Cigna employs three types of agents: (1) active agents receive an office, administrative support and all fringe benefits, (2) retired agents receive an office, administrative support and partial fringe benefits, and (3) brokers do not receive an office, administrative support, or any fringe benefits.

accurately reports the discussion. During this conversation, Phillips and Williams stated their respective positions repetitively and unyieldingly, but with little rancor. Phillips maintained that Williams's abysmal sales record and heavy indebtedness to the company, and not his age, had brought about the decision to terminate him from active agent status. Phillips told Williams that to continue as an active agent he had to pay $18,000 on his company debt of approximately $30,000 immediately and pay an additional $500 each month until his sales commissions increased enough to cover his operating and office expenses. Williams said that he thought he was being discriminated against because of his age. He expressed his willingness to pay his debt and to work to increase his sales. But he contended that he could not do so unless he continued as an active agent with the full support of the organization.

Phillips, in effect, said that the company had gone as far as it was willing to go; that to allow Williams to maintain active status would add to organizational expenses and increase Williams's debt with little prospect of a dramatic increase in his sales. In response to Williams's question, Phillips said it would be acceptable for Williams to borrow $18,000 from a third person in order to stay in active agent status with the organization. But Williams did not pursue that idea. Instead, he said, "Well, I don't have anything that I can say to you that I'm going to do or not going to do. I just want the opportunity to serve my clients

and to make money."  At that point Phillips asked what Williams planned to do about "this discrimination thing."  Williams said he did not plan to stop it but to let it run its course.  Phillips responded, "Okay.  What I want you to do is I want you to get all your stuff and move all your stuff out of the office, okay, ASAP."  When Williams asked, "Are you kicking me out?", Phillips replied, "Yeah.  I have been planning to kick you out for about three weeks."

Phillips explained to Williams that as an active agent he had been the lowest producer the previous year, that other active agents who failed to meet production requirements were paying $500 per month, that none of them owed the company nearly as much as Williams did, and that he did not believe Williams could pay $500 per month; but, Phillips ended up saying, "pay me and you can stay . . . if you come clean with this deal, you pay me off, we got a different deal.  If not, leave.  All I want is my money."  Phillips refused Williams's request that he be allowed to take his client files, because under the agreement Williams signed the files were CIGNA property.  When Williams asked what would happen if he continued to come into the CIGNA office and try to do business, Phillips told him that he and his belongings would be moved out.

On January 13, 1994, Williams filed a retaliation complaint with the EEOC.  On January 14, 1994, Williams recorded a shorter meeting he had with Phillips.  Phillips asked Williams, "Have you thought . . . of anything that you would like to get out of it that

would cause you to drop the charge?" Williams replied, "Nothing at the moment . . . ." Phillips agreed to give Williams assistance in packing his property into a truck, to forward his mail and phone calls, and to let him have access to his office during regular hours for a period of time to tend to clients he was still seeing. Phillips added, "We'll do everything that we can to help you, Arthur. I just, for the life of me, I cannot understand why you would go down there and file that suit and put yourself through this."***"Because you wouldn't have gone through this if you wouldn't have filed that suit." Williams complained about not being permitted to take his client files because of the CIGNA rules that provided the client files were company property. Phillips said, "Well, you can start changing these rules now. I mean, if you want to negotiate some deal, you can start changing this stuff. You know, as long as you got that grievance hanging over our head, we are just going right down the policy line . . . . the ball is in your court."

The transcripts of Williams's recordings of the two meetings do not indicate that he ever offered a concrete proposal for repayment of any of his debt or that he ever stated that he would sign a retirement agreement.

Williams obtained an EEOC right to sue letter and brought suit against Cigna in state court for age discrimination in violation of the ADEA and the Texas Commission on Human Rights Act of 1983, and for unlawful retaliation in violation of the ADEA. Cigna removed

the case to federal court and obtained a stay pending arbitration. The district court denied Cigna's motion but on appeal, a prior panel of this court reversed and remanded for entry of a stay. See Williams v. Cigna Financial Advisors, Inc., 56 F.3d 656, 658 (5th Cir. 1995) (holding that the dispute was arbitrable under the arbitration agreement in the U-4 Form signed by Williams). Williams submitted his claims to an arbitration panel pursuant to NASD regulations. Cigna filed a counter claim based on Williams's debt to the company. Following the hearing, the arbitration panel issued a written award denying Williams's ADEA claims and awarding Cigna $18,945 on its counterclaim. The panel's written opinion fully states the issues submitted and the conclusions reached, but it gives no rationale or reasons for the decision.

Williams moved the district court to vacate the arbitration award, and the defendants moved to have it confirmed. In its memorandum opinion and order the district court assigned reasons for its rejection of some of Williams's arguments, viz., that the arbitration award should be vacated because the panel did not give reasons for its decision, that Williams was denied adequate discovery or a continuance, and that the arbitrators were not sufficiently qualified. The district court rejected Williams's other arguments without assigning specific reasons. After the district court entered a final judgment, Williams appealed.

## II. STANDARD OF REVIEW

Under the FAA, review of a district court decision confirming an arbitration award on the ground that the parties agreed to submit their dispute to arbitration proceeds like review of any other district court decision finding an agreement between parties, e.g., accepting findings of fact that are not "clearly erroneous" but deciding questions of law *de novo*.  See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 948, 115 S. Ct. 1920, 131 L.Ed.2d 985 (1995); Gateway Technologies, Inc. v. MCI Telecommunications Corp., 64 F.3d 993, 996 (5th Cir. 1995).

Because a party who has not agreed to arbitrate normally has a right to seek a court's decision on the merits of his or her dispute with another person, the party's agreement to arbitrate that matter under the FAA is a relinquishment of much of that right's practical value. See First Options, 514 U.S. at 942.  "The party still can ask a court to review the arbitrator's decision, but the court will set that decision aside only in very unusual circumstances.  See, e.g., 9 U.S.C. § 10 (award procured by corruption, fraud, or undue means; arbitrator exceeded his powers); Wilko v. Swan, 346 U.S. 427, 436-437[](1953)(parties bound by arbitrator's decision not in 'manifest disregard' of the law)[.]" First Options, 514 U.S. at 942 (noting that Wilko was overruled on other grounds by Rodriquiz de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S. Ct. 1917, 104 L.Ed.2d 526 (1989)).

Before First Options, the state and federal courts had begun

to recognize nonstatutory standards of judicial review of challenged arbitral awards under the Labor Management Relations Act (LMRA) and the FAA, relying on the statements of the Supreme Court in Wilko, 346 U.S. at 436-37 (award valid if not in "manifest disregard" of the law), and United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960)(award legitimate if "it draws its essence from the collective bargaining agreement."). GABRIEL M. WILNER, 1 DOMKE ON COMMERCIAL ARBITRATION § 34:01, at 2 (Rev. ed. 1998). Most state and federal courts recognized one or more nonstatutory grounds warranting vacatur of an arbitral award, including: (1) the arbitrator's manifest disregard of the law; (2) the award's conflict with a strong public policy; (3) the award being arbitrary and capricious; (4) the award being completely irrational; or (5) the award's failure to draw its essence from the underlying contract. Id. § 34:07, at 14.

Panels of this circuit have recognized at least three of these nonstatutory grounds for vacatur of arbitration awards in LMRA and FAA cases: (1) Award contrary to public policy. See Exxon Corp. v. Baton Rouge Oil and Chemical Workers, 77 F.3d 850, 853 (5th Cir. 1996); Gulf Coast Industrial Workers Union v. Exxon Co., U.S.A., 991 F.2d 244, 248-55 (5th Cir.) (citing United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 43, 108 S. Ct. 364, 98 L.Ed.2d 286 (1987)), cert. denied, 510 U.S. 965, 114 S. Ct. 441, 126 L.Ed.2d 375 (1993). (2) Arbitrary and capricious award.

See Manville Forest Products Corp. v. United Paperworks International Union, 831 F.2d 72, 74 (5th Cir. 1987); Safeway Stores v. American Bakery and Confectionary Workers, Local 111, 390 F.2d 79, 82 (5th Cir. 1968). (3) Award's failure to draw its essence from underlying contract. See Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc., 138 F.3d 160, 164 (5th Cir. 1998); Exxon Corp. v. Baton Rouge O.C.W., 77 F.3d 850, 853 (5th Cir. 1996); Executone Information Systems, Inc. v. Davis, 26 F.3d 1314, 1324 (5th Cir. 1994)(citing United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)); Anderman/Smith Operating Co. v. Tennessee Gas Pipeline Co., 918 F.2d 1215, 1218 (5th Cir. 1990).

Prior to the Supreme Court's decision in First Options, two panels of this circuit declined to recognize the manifest disregard standard in FAA cases involving commercial contract disputes between security brokers and investors. See McIlroy v. PaineWebber Inc., 989 F.2d 817 (5th Cir. 1993); R.M. Perez & Associates, Inc. v. Welch, 960 F.2d 534 (5th Cir. 1992). In a third FAA case pre-dating First Options, involving a commercial dispute between parties to an oil purchase contract, a panel of this court stated in dictum that judicial review of a commercial arbitration award is limited to sections 10 and 11 of the FAA. See Forsythe International, S.A. v. Gibbs Oil Co., 915 F.2d 1017, 1019 (5th Cir. 1990). The panel did not consider or decline to recognize a nonstatutory basis for vacatur, because the district court had

vacated and remanded the arbitration award for fraud and misconduct solely on FAA statutory grounds.

Consequently, this is the first case in which we consider recognition of the manifest disregard of the law standard in reviewing the compulsory arbitration of an employee's federal statutory employment rights claim under the FAA based on the employee's non-collective bargaining agreement to arbitrate as a pre-condition of his employment. And it is the first time we have considered whether to apply the manifest disregard standard since it was approved by the Supreme Court in First Options.

This case involves a claim under the ADEA, but our decision will have implications for the review of arbitration claims under the FAA involving Title VII of the Civil Rights Act of 1964 (Title VII) and other federal employment rights statutes. Employees, as individuals, are protected by a wide variety of rights created by federal statutes. See IAN R. MACNEIL ET AL., 2 FEDERAL ARBITRATION LAW § 16.5.1.1, at 16:76. These include Title VII, which protects individuals against discrimination in employment and seeks to assure equal employment opportunities; the Fair Labor Standards Act (FLSA), which provides employees with a judicial remedy in the federal courts to enforce the statutory right to minimum wages and overtime pay claims against employers; and the ADEA, which protects employees 40 years of age or older who are fired or discriminated against because of age. The ADEA has been called a "hybrid" between Title VII and the FLSA, because it draws upon Title VII for

its substantive provisions and upon the FLSA for its remedial scheme. Id.; see Comment, The Arbitrability of ADEA Claims: Toward an Epistemology of Congressional Silence, 23 COLUM. J.L. & SOC. PROBS. 67, 74-83 (1989).

Williams and his amici argue that we should recognize that an arbitrator's award under the FAA compulsorily adjudicating an individual employee's federal statutory employment claim may be vacated for manifest disregard of the law because of First Options' approval of the standard for use in all FAA cases, and because Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S. Ct. 1647, 114 L.Ed.2d 26 (1991) and its progeny require judicial scrutiny of arbitration awards under the FAA involving ADEA and Title VII claims sufficient to ensure that arbitrators comply with the requirements of those federal employment anti-discrimination statutes. We agree.

In our opinion, clear approval of the "manifest disregard" of the law standard in the review of arbitration awards under the FAA was signaled by the Supreme Court's statement in First Options that "parties [are] bound by [an] arbitrator's decision not in 'manifest disregard' of the law." First Options, 514 U.S. at 942. Accord Montes v. Shearson Lehman Brothers, Inc., 128 F.3d 1456, 1459 (11th Cir. 1997); Barnes v. Logan, 122 F.3d 820 (9th Cir. 1997), cert. denied, 118 S. Ct. 1385 (1998); Cole v. Burns International Security Services, 105 F.3d 1465, 1486 (D.C. Cir. 1997); M & C Corp. v. Erwin Behr GmbH & Co., KG, 87 F.3d 844 (6th Cir. 1996); see

IAN R. MACNEIL ET AL., 4 FEDERAL ARBITRATION LAW § 40.7.1, at 40:43 (Supp. 1999)(First Options "giv[es] the Supreme Court's seal of approval to manifest disregard doctrine[.]").  Even before First Options, many circuits had adopted the manifest disregard of law standard in reviewing arbitration awards under the FAA.  See United Transportation Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376 (3d Cir. 1995); Remmey v. PaineWebber, Inc., 32 F.3d 143 (4th Cir. 1994), cert. denied, 513 U.S. 1112, 115 S. Ct. 903, 130 L.Ed.2d 786 (1995); Lee v. Chica, 983 F.2d 883 (8th Cir.), cert. denied, 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 237 (1993); Health Services Management Corp. v. Hughes, 975 F.2d 1253 (7th Cir. 1992); Advest, Inc. v. McCarthy, 914 F.2d 6 (1st Cir. 1990); Jenkins v. Prudential-Bache Securities, Inc., 847 F.2d 631 (10th Cir. 1988); Merrill Lynch, Pierce, Fenner & Smith v. Bobker, 808 F.2d 930 (2d Cir. 1986); Bender v. Smith Barney, Harris Upham & Co., 901 F. Supp. 863 (D.N.J. 1994), aff'd, 67 F.3d 291 (3d Cir. 1995). Accordingly, each of the other numbered federal circuit courts and the D.C. Circuit have recognized manifest disregard of the law as either an implicit or nonstatutory ground for vacatur under the FAA.  See MACNEIL, supra, § 40.7.2.1.

Prior to Gilmer, three courts of appeals had barred the enforcement of agreements in individual employment contracts subject to the FAA to arbitrate Title VII claims.  See Alford v. Dean Witter Reynolds, Inc., 905 F.2d 104 (5th Cir. 1990), vacated, 500 U.S. 930, 111 S. Ct. 2050, 114 L.Ed.2d 456 (1991); Utley v.

<u>Goldman, Sachs & Co.</u>, 883 F.2d 184 (1st Cir. 1989), <u>cert. denied</u>, 493 U.S. 1045, 110 S. Ct. 842, 107 L.Ed.2d 836 (1990); <u>Swenson v. Management Recruiters International, Inc.</u>, 858 F.2d 1304 (8th Cir.), <u>cert. denied</u>, 493 U.S. 848, 110 S. Ct. 143, 107 L.Ed.2d 102 (1989). One court of appeal and a majority of district courts that had addressed the issue had held that ADEA claims between private employees and employers are nonarbitrable under the FAA. <u>See</u> <u>Nicholson v. CPC International, Inc.</u>, 877 F.2d 221, 333 (3rd Cir. 1989); <u>see</u> G. Richard Shell, <u>ERISA and other Federal Employment Statutes: When Is Commercial Arbitration an "Adequate Substitute" for the Courts?</u>, 68 Tᴇx. L. Rᴇv. 509, 571 n.447 (1990). The reasoning of these courts and scholarly commentators of the same view may be paraphrased as follows: The antidiscrimination purpose of Title VII and ADEA and the statutes' focus on providing both individual remedies and mechanisms for institutional reform suggest that private arbitration of claims will conflict with the statutory goals. Commercial arbitration is focused too narrowly on specific transactions to give effect to the institutional goals of the legislation. Industry customs and norms that inform commercial arbitral decision making may be infected with the very biases the statutes were enacted to overcome. This possibility argues strongly for the adjudication of claims under Title VII and the ADEA by the courts or an independent government tribunal. "Finally, cases brought under the [statutes] are not purely economic in nature. Rather they involve questions of personal

dignity and worth that are precisely the kinds of 'core value' questions that should be reserved for a court.  It is thus not stretching too far to assume that Congress meant to forbid private arbitration of [Title VII and ADEA] discrimination claims under the FAA."  Shell, supra, at 568-70, 571-72; see Comment, supra, at 109-12, 113-14.

In Gilmer, however, the Supreme Court rejected arguments based on these reasons in holding that an employee's ADEA claim can be subjected to compulsory arbitration under the FAA pursuant to a non-collective bargaining agreement to arbitrate signed by the employee as a pre-condition of his employment.  The Court agreed that the ADEA is designed not only to address individual grievances, but also to further important social policies.  But, the Court reasoned, the Sherman Act, the Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act (RICO), and the Securities Act of 1933 all are designed to advance important public policies, and the Court had already held that claims under them are appropriate for arbitration.  Gilmer, 500 U.S. at 27.

Further, the Court based its decision on three crucial assumptions or predictions: (1)"'[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'"  Id. at 25 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S.

614, 628, 105 S. Ct. 3346, 87 L.Ed.2d 444 (1985)); (2) "'[S]o long as the prospective litigant may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.'" Id. at 27 (quoting Mitsubishi, 473 U.S. at 628); and (3) "'although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute' at issue." Id. at 32 n.4 (quoting Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 232, 107 S. Ct. 2332, 96 L.Ed.2d 185 (1987)).

Following the Gilmer reasoning, most of the courts of appeals have concluded that individual Title VII claims can be subjected to compulsory arbitration under employees' non-collective bargaining agreements to arbitrate pursuant to the FAA. See Seus v. John Nuveen & Co., 146 F.3d 175 (3d Cir. 1998), cert. denied, 119 S. Ct. 1028 (1999); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832 (8th Cir. 1997); Cole v. Burns International Security Services, 105 F.3d 1465 (D.C. Cir. 1997); Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482 (10th Cir. 1994); Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698 (11th Cir. 1992); Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305 (6th Cir. 1991); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229 (5th Cir. 1991). The Ninth Circuit has held, however, that Congress in the Civil Rights Act of 1991 intended to preclude the arbitration of Title VII and, perhaps, other civil rights claims. See Duffield v. Robertson Stephens &

<u>Co.</u>, 144 F.3d 1182 (9th Cir.), <u>cert. denied</u>, 119 S. Ct. 465 (1998).

The Supreme Court's assumptions and predictions in <u>Gilmer</u> assign heavy responsibilities to arbitrators and the federal courts. Arbitrators have a duty to ensure that, in the prospective subjection of federal statutory employment rights claims to compulsory arbitration, employees will not forgo substantive statutory rights or effective vindication of their statutory causes of action, and the statutes will continue to serve both their remedial and deterrent functions. The federal district courts and courts of appeals are charged with the obligation to exercise sufficient judicial scrutiny to ensure that arbitrators comply with their duties and the requirements of the statutes. In other words, the <u>Gilmer</u> Court anticipated that an employee's prospective waiver of the right to a court's decision about the merits of his or her future ADEA or Title VII disputes would not have the effect that it does in ordinary commercial arbitration–"relinquishment [of] much of that right's practical value." <u>First Options</u>, 514 U.S. at 942. Accordingly, the judicial review of arbitral adjudication of federal statutory employment rights under the FAA and the "manifest disregard of the law" standard "'must be sufficient to ensure that arbitrators comply with the requirements of the statute' at issue." <u>Gilmer</u>, 500 U.S. at 32 n.4 (quoting <u>Shearson/American Express</u>, 482 U.S. at 232); <u>see Cole</u>, 105 F.3d at 1487.

Williams also urges us to recognize and apply another standard of review, viz., by analogy, the standard adopted by this court in

<u>Rios v. Reynolds Metals Co.</u>, 467 F.2d 54 (5th Cir. 1972), for reviewing the determination by a district court, in deciding an employee's Title VII claim, whether to defer to a prior arbitration award under a collective bargaining agreement. But the differences between collective bargaining contract arbitration under the LMRA and commercial arbitration under the FAA are too great for us to easily infer that the deferral standard once used with regard to the former is suitable as a judicial review standard with respect to the latter. The Supreme Court's opinions and scholarly commentary have cogently pointed out the inherent differences in purpose, structure, and methodology between labor and commercial arbitration. <u>E.g., Gilmer</u>, 500 U.S. at 33-35; <u>see</u> Shell, <u>supra</u>, at 512 ("The differences between these two arbitration forums run deep. Scholars have long noted two models of the arbitration process. Under the first model, arbitration is viewed as a form of extended negotiation between highly interdependent parties . . . . Under the second model, arbitration is a cheap and efficient form of trial for resolving transactional disputes. The second model requires arbitrators to act as judges." (footnotes omitted)). In fact, the disparities are so great that they largely explain the difference in attitude of the Supreme Court in permitting only discretionary deference to labor arbitration awards under LMRA collective bargaining agreements by courts in Title VII actions, <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 58, 94 S. Ct. 1011, 39 L.Ed.2d 147 (1974) (rejecting the more stringent deferral

standard of Rios, 467 F.2d at 58), while allowing ADEA claims to be subjected to compulsory arbitration under the FAA pursuant to a prospective pre-employment arbitration agreement. Gilmer, 500 U.S. at 27; see Shell, supra, at 510-40.

## III. DISCUSSION

### A. The Abitrators' Adjudication of the ADEA Claim

The concept of "manifest disregard of the law" has not been defined by the Supreme Court. The circuits have adopted various formulations.[2] As indicated by our foregoing recognition of the standard, we agree with the D.C. Circuit that, "in this statutory context, the 'manifest disregard of law' standard must be defined in light of the bases underlying the Court's decisions in Gilmer-type cases." Cole, 105 F.3d at 1487. Professors MacNeil, Speidel,

---

[2] See, e.g., Advest Inc. v. McCarthy, 914 F.2d 6, 8-9 (1st Cir. 1990)("where it is clear from the record that the arbitrator recognized the applicable law-and then ignored it"); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933-34 (2d Cir. 1986)("The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it." (citations omitted)); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995)("an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle."); Health Services Management Corp. v. Hughes, 975 F.2d 1253, 1267 (7th Cir. 1992)("there must be something beyond and different from mere error in law or failure on the part of the arbitrators to understand or apply the law; it must be demonstrated that the majority of arbitrators deliberately disregarded what they knew to be the law in order to reach the result they did.").

and Stipanowich have made a "modest proposal" that should prove helpful as a basis for articulating and applying the manifest disregard doctrine in the present context:

> First, where on the basis of the information available to the court it is not manifest that the arbitrators acted contrary to the applicable law, the award should be upheld.
> Second, where on the basis of the information available to the court it is manifest that the arbitrators acted contrary to the applicable law, the award should be upheld unless it would result in significant injustice, taking into account all the circumstances of the case, including powers of arbitrators to judge norms appropriate to the relations between the parties.

MACNEIL, supra, § 40.7.2.6, at 40:95 (footnote omitted).

On the information available to us in the present case, which includes a verbatim transcript of the proceedings, we conclude that it is not manifest that the arbitrators acted contrary to the applicable law in rejecting Williams's ADEA age discrimination and retaliation claims. Consequently, in this case, we need not undertake the second step of the manifest disregard analysis, which entails an inquiry into whether the award will result in significant injustice, that comes into play only when it is manifest that the arbitrators acted contrary to the applicable law.

The evidence solidly supports a reasonable finding that Cigna terminated Williams's active agent status, not because of his age, but because of his long period of less than cost-effective sales performance and his burgeoning indebtedness to the company resulting from his loans against anticipated but unrealized commissions.

Nor is it manifest that the arbitrators acted contrary to the applicable law in rejecting Williams's retaliation claim.[3] While it is undisputed that Williams's filing of an EEOC charge constituted participation in a protected activity, a reasonable arbitrator could have found that he did not suffer an adverse employment action and that any disadvantage he suffered was not causally related to his EEOC claim. At the meeting on December 22, 1993, the Cigna officers told Williams that if he could not reduce his debt to the company by $18,000 immediately, that he must accept the company's offer to allow him to change to retired agent or broker status before January 1, 1994 or his relationship with Cigna would be terminated completely. Williams rejected Cigna's offer of retired agent or broker status by his failure to accept the offer before it expired on January 1, 1994 and resulted in his absolute termination. Because Williams filed his EEOC complaint four days later on January 5, 1994 there is no evidence of a causal link between his complaint and his termination.[4]

---

[3] It is unlawful for an employer to retaliate against an employee for filing a charge pursuant to the ADEA. 29 U.S.C. § 623(d). To establish a prima facie case of unlawful retaliation, a plaintiff must show: (1) participation in a protected activity; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. See Holt v. JTM Industries, Inc., 89 F.3d 1224, 1225-26 (5th Cir. 1996), cert. denied, 520 U.S. 1229, 117 S. Ct. 1821, 137 L.Ed.2d 1029 (1997).

[4] The after-the-fact remarks by Phillips upon learning of Williams's ADEA claim do not evince retaliatory motive or action. Rather, Phillips's comments may be read as an expression of his candid opinion that Williams had been foolish to reject Cigna's

Consequently, we conclude that based on the record presented for our review it is not manifest that the arbitrators acted contrary to the applicable law and that their award should be upheld insofar as their rejection of the ADEA discrimination and retaliation claims are concerned.

## B. Private Arbitration Panel "Forum" Fees

Williams alternatively contends that the arbitrators' order that he pay $3,150 as his one-half share of the forum fees is contrary to public policy. In support of this argument, Williams relies on the D.C. Circuit's interpretation of <u>Gilmer v. Interstate\Johnson Lane Corp.</u>, 500 U.S. 20 (1991), as holding implicitly that as a matter of law ADEA claimants may not be forced to pay any part of arbitrators' fees and expenses. <u>Cole</u>, 105 F.3d at 1483-86; <u>accord Shankle v. B-G Maintenance Management of Colorado, Inc.</u>, 163 F.3d 1230, 1235 (10th Cir. 1999). In our opinion, however, <u>Gilmer</u> does not so clearly imply that no part of arbitral forum fees may ever be assessed against federal anti-discrimination claimants, although it plainly indicates that an arbitral cost allocation scheme may not be used to prevent

---

offer of retirement status to pursue a groundless discrimination claim; as requests that Williams drop the ADEA charges; and as overtures of compromise or settlement of the ADEA claims. The anti-retaliation provisions of the ADEA are not violated by an employer's reasonable defensive measures, requests to drop charges, or settlement proposals, unless they harm or disadvantage the employee. <u>See Torres v. Pisano</u>, 116 F.3d 625, 639-40 (2d Cir.), <u>cert. denied</u>, 118 S. Ct. 563 (1997); <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1178-79 (1st Cir.), <u>cert. denied</u>, 501 U.S. 1218, 111 S. Ct. 2828, 115 L.Ed.2d 997 (1991).

effective vindication of federal statutory claims. Gilmer, 500 U.S. at 28.

The Supreme Court in Gilmer made it clear that a party agreeing to arbitrate a federal statutory claim does not forgo the substantive rights afforded by the statute, and that claims under federal statutes are appropriate for arbitration so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum, and the statute will continue to serve both its remedial and deterrent function. Gilmer, 500 U.S. at 26, 28. Gilmer, and the cases upon which it relies, make clear that whether a federal statutory claim can be subjected to compulsory arbitration depends upon whether the particular arbitral forum involved provides an adequate substitute for a judicial forum in protecting the particular statutory right at issue. See Shearson/American Express, 482 U.S. at 229; McDonald v. City of West Branch, 466 U.S. 284, 290, 104 S. Ct. 1799, 80 L.Ed.2d 302 (1984). "In arguing that arbitration is inconsistent with the ADEA, Gilmer . . . raise[d] a host of challenges to the adequacy of arbitration procedures." Gilmer, 500 U.S. at 30. The Court rejected each of Gilmer's arguments in whole or in substantial part because of the particular characteristics of the NYSE arbitral forum. The NYSE arbitration rules and judicial review provided adequate protections against biased panels. Id. The NYSE discovery provisions, which allowed document production, information requests, depositions, and subpoenas would be adequate

to allow ADEA claimants a fair opportunity to present claims. <u>Id.</u> at 31. Although some arbitrators often will not issue written opinions, the NYSE rules require that all arbitration awards be in writing. <u>Id.</u> Although arbitration procedures do not provide for class actions, the NYSE rules do not restrict the types of relief, allowing arbitrators to fashion equitable relief, and do provide for collective proceedings. <u>Id.</u> at 32. The Court in <u>Gilmer</u> did not consider the question of whether an arbitration forum that requires an ADEA claimant to pay all or part of the arbitrators' compensation can be an adequate substitute for a judicial forum. Evidently, Gilmer did not include a complaint about forum fees in his host of challenges.[5] In concluding its disposition of Gilmer's challenges to the adequacy of arbitration procedures, however, the <u>Gilmer</u> Court pointed to some of the basic principles governing the enforceability of arbitration contracts and procedures: (1) "arbitration agreements are enforceable 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" <u>Gilmer</u>, 500 U.S. at 33 (citing 9 U.S.C. § 2); (2) "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any

---

[5] According to the D. C. Circuit, at the time of Gilmer's claim, under the NYSE and NASD Rules, it was standard practice in the securities industry for employers to pay all of the arbitrators' fees. <u>See Cole</u>, 105 F.3d at 1483 (citing Daily Lab. Rep. (BNA) No. 93, at A-3 (May 14, 1996)).

contract,'" id. (citing Mitsubishi, 473 U.S. at 627); and (3) "claimed procedural inadequacies [and] claim[s] of unequal bargaining power [are] best left for resolution in specific cases." Id.

Under the NASD regulations in effect at the inception of this case, a party who files an arbitration claim is required to pay a non-refundable filing fee and a hearing session deposit "unless such fee or deposit is specifically waived by the Director of Arbitration." NASD CODE OF ARBITRATION PROCEDURE § 10205(a) (Aug. 1996). NASD regulations also direct arbitrators to "determine the amount chargeable to the parties as forum fees and [] determine who shall pay such forum fees." NASD CODE OF ARBITRATION PROCEDURE, supra, § 10205(c).

Pursuant to these regulations, Williams paid a non-refundable filing fee of $500 and a hearing session deposit of $1,500 prior to the arbitration hearing. The forum fees were calculated at the rate of $1,500 for each hearing session and $300 for each pre-hearing conference, for a total cost of $6,300. The arbitration panel assessed the costs of the forum fees equally between the two sides and, after subtracting Williams' $1,500 deposit, determined that he owed $1,650 for forum fees.

While this case was pending, the SEC on June 29, 1998 approved a proposed rule change offered by the NASD that abolishes mandatory NASD arbitration of statutory employment discrimination claims. See Self Regulatory Organizations; National Association of

Securities Dealers, Inc.; Order Granting Approval to Proposed Rule Change Relating to the Arbitration of Employment Discrimination Claims, 63 Fed. Reg. 35299, 35303 (1998). The rule change became effective on January 1, 1999. Id.; see Desiderio v. National Association of Securities Dealers, Inc., 191 F.3d 198, 201 (2d Cir. 1999).

In the present case, Williams has not demonstrated that the arbitrators' order that he pay one-half of the forum fees prevented him from having a full opportunity to vindicate his claims effectively or prevented the arbitration proceedings from affording him an adequate substitute for a federal judicial forum. The evidence in this case does not indicate that Williams is unable to pay one-half of the forum fees or that they are prohibitively expensive for him. Cf. Shankle, 163 F.3d at 1230 (plaintiff "could not afford such a fee"); Cole, 105 F.3d at 1484 (fees "prohibitively expensive for an employee like Cole"). In the arbitration hearing on October 16, 1996 Williams testified that he was making more money than he did at Cigna and his "income so far this year is excess of six figures." There is no evidence that the prospect of incurring forum fees hampered or discouraged Williams in the prosecution of his claim. Because of NASD's rule change abolishing mandatory arbitration of statutory employment discrimination claims, such causes of action arising after January 1, 1999 may be filed in the appropriate state or federal court. Consequently, the present case clearly does not call upon us to address the serious

question of whether the legislative intent of employees' anti-discrimination statutes in general is undermined by the effects of mandatory arbitration and arbitrators' fees.

## IV. CONCLUSION

For the reasons assigned, the judgment of the district court upholding the arbitrators' award is AFFIRMED.