921 A.2d 799

**Sheri JACKSON**

v.

**PASADENA RECEIVABLES, INC.**

**No. 106, Sept. Term, 2006.**

Court of Appeals of Maryland.

April 11, 2007.

Reconsideration Denied June 6, 2007.

Ralph T. Byrd, Laytonsville, for petitioner.

Ronald S. Canter (Harry K. Wolpoff and Robert J. Burstein of Wolpoff and Abramson, L.L.P., Rockville; Michele R. Gagnon of Peroutka & Peroutka, P.A., Pasadena), all on brief, for respondent.

Argued before RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, and JOHN C. ELDRIDGE and ALAN M. WILNER (Retired, specially assigned), JJ.

WILNER, J.

This case began as a routine collection action in the District Court to recover judgment on a $5,146 credit card debt. The debtor, Sheri Jackson, has never denied that she used the credit card to purchase the items which, together with finance charges, comprise the debt and that, at some point, she simply stopped making payments on the account. Her defense, presented entirely through counsel, was that, because she never signed the credit card agreement and the credit card issuer, Citibank, made no reasonable attempt to obtain her signature, the credit card agreement violates a provision of the Maryland Retail Credit Accounts Law (RCAL), codified at Maryland Code, § 12–503(e)(1) of the Commercial Law Article (CL). As a result, Ms. Jackson claimed that, in accordance with CL § 12–513(a), all of the finance charges that had ever been assessed during the nine years that she used the credit card were forfeited.

Jackson made no effort to calculate the amount of those charges, so, except for an unsworn assertion by Pasadena that they did not exceed $1,745, the record is silent as to what they are—what proportion of the acknowledged $5,146 balance they might be. No counter-claim was filed by Jackson. She simply argued that, because of the statutory violation, neither Citibank nor the plaintiff in the action, Pasadena Receivables, Inc., to which Citibank had assigned the account, was entitled to recover any part of the $5,146 balance.

The District Court found no merit in Jackson's defense and entered judgment for Pasadena. On appeal, the Circuit Court for Baltimore City affirmed the District Court judgment. We

granted *certiorari* and shall affirm the judgment of the Circuit Court.

## BACKGROUND

Maryland's RCAL was first enacted in 1967; it now appears as title 12, subtitle 5 of the Commercial Law Article (CL § § 12–501 through 12–515). Section 12–501(*l*) defines "retail credit account" as "an agreement or transaction for the retail sale of goods or services, which is negotiated or entered into and pursuant to which a time sale price is established" and adds that the definition "includes credit card financing by a financial institution." Section 12–502(a) requires that every retail credit account established after May 31, 1967 comply with the subtitle. Section 12–512 provides that "[n]o act, agreement, or statement of a buyer may constitute a valid waiver of any benefit or protection provided to him under this subtitle."

The law establishes detailed requirements with respect to retail credit accounts, including maximum interest that may be charged, information that must be disclosed to the buyer, the size of type that must be used to convey certain information, and the frequency with which information must be disclosed. The specific requirement most relevant here is contained in § 12–503(e)(1)—that a retail credit account agreement shall be in writing and that either it shall be signed by the buyer, or the seller or financial institution shall have made a reasonable attempt to obtain the signature of the buyer to the agreement. Section 12–513(a) imposes a civil penalty for violation of the Act: "if a holder violates any provision of this subtitle, no holder may collect or receive any finance charge from the buyer."

Jackson at some point received a credit card from Citibank, a national bank located in South Dakota. With its Statement of Claim, Citibank's assignee, Pasadena, asserted that the account was initially opened in December, 1994, but that the original application and contract had either been destroyed or lost and was unavailable. It attached a 1999 Credit Card

Agreement, which set forth the terms and conditions relating to the credit card and its use and, among other things, stated, under the heading "Applicable Law," that "[t]he terms and enforcement of this Agreement shall be governed by federal law and the law of South Dakota, where we are located." There is no place in the agreement for a signature by the holder. Jackson used the card to make purchases for approximately nine years, and, apparently without any objection regarding the absence of a signed agreement, consistently maintained a balance on the card since then.

At the time suit was filed, the balance on the account was $5,146. It was agreed that the account had never been used to obtain cash advances, but only to purchase goods and services, and that it had been validly assigned to Pasadena. Other than the unsworn assertion by Jackson's counsel, there was no evidence that Jackson had not signed an application for the credit card or the original credit card agreement or that no effort had been made by Citibank to obtain her signature. Pasadena refused to stipulate to those assertions by counsel, although its attorney acknowledged that would be her testimony. There never was any testimony by Jackson, however, or by anyone else. The case proceeded solely on the stipulation that Jackson had the account, that she used the account to make purchases but not cash advances, that she kept a balance on the account over a nine-year period, that the principal balance on the account was $5,146, that the account had been assigned to Pasadena, and that the court could consider the documents that had been attached to Pasadena's complaint, among which was the 1999 agreement.

In response to Jackson's RCAL defense, Pasadena noted the choice of law provision in the agreement and pointed out, without contradiction, that South Dakota law allows an account to be opened without a signed application. It urged as well that (1) RCAL was preempted by §§ 85 and 86 of the National Banking Act, (2) a later-enacted Maryland law, § 5–408 of the Cts. & Jud. Proc. Article, provides that credit card agreements do not have to be signed by the buyer and thus, to the extent of that inconsistency, prevails over CL § 12–503(e),

and (3) the finance charges that would be subject to forfeit under § 12–503(e) do not, in any event, exceed $1,745. After considering memoranda filed by the parties, the District Court found the choice-of-law argument telling and therefore held that South Dakota law was applicable. Because that law permits a credit card account to be opened without a signed application, the court rejected Jackson's RCAL defense and entered judgment for the agreed amount of $5,146, plus accrued interests, costs, and attorneys' fees allowed under the agreement. The court did not address the preemption issue or any of Pasadena's other arguments, as it was not necessary to do so.

Jackson filed a motion for reconsideration, complaining that the court had considered the 1999 agreement when it was apparent that the account had been opened much earlier. In denying the motion, the court reminded Jackson that, through counsel, she had stipulated that the court could consider that agreement, which was attached to Pasadena's complaint.

On appeal, the Circuit Court affirmed, for the same reason applied by the District Court. The court noted that the "primary issue presented" was whether the (1999) credit card agreement was controlling and the choice-of-law provision in it was enforceable. The court answered both questions in the affirmative. As did the District Court, the Circuit Court turned to *Restatement (Second) of Conflicts,* § 187(2), which provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless (a) the chosen State has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen State would be contrary to a fundamental policy of a State which has a materially greater interest than the chosen State in the determination of the particular issue. The court found neither exception applicable.

## DISCUSSION

Although there may be other reasons why Jackson's defense would fail, we shall follow the course of the two lower courts

and base our decision on the choice of law provision in the credit card agreement. Whether or not rejection of Jackson's RCAL defense would be required as well on a theory of Federal preemption, as argued by Pasadena, our enforcement of the contractual provision is clearly harmonious with the result that would obtain if we applied that doctrine.[1]

Jackson has not denied the existence of the 1999 agreement that was attached to Pasadena's Statement of Claim. Her unsworn defense to that agreement is the same as to the initial agreement—she never signed it and Citibank made no attempt to obtain her signature. That defense, as noted, rests principally on three provisions of RCAL: § 12–503(e), which requires either that a retail credit account be signed by the buyer or that the issuer have made a reasonable attempt to

---

1. It may be that CL § 12–503(e) is preempted by the National Banking Act, but the preemption argument made by Pasadena is a limited one that centers on §§ 85 and 86 of that Act (12 U.S.C. §§ 85, 86), which deal only with the amount and rate of interest that may be charged by national banks. Although it is arguable that, by precluding a national bank from receiving any finance charges upon a failure to obtain (or attempt to obtain) a holder's signature, RCAL has inhibited a national bank from charging interest that § 85 allows, preemption is more likely to arise from 12 U.S.C. § 24, not mentioned by Pasadena, which authorizes national banks to exercise all incidental powers necessary to carry on the business of banking. Pursuant to that section, § 93a, authorizing the Comptroller of the Currency to adopt regulations to carry out the responsibility of the Office, and § 27, subjecting national banks to regulations issued by the Office of the Comptroller of the Currency, the OCC adopted 12 C.F.R. § 7.4008(d), which declares that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers are not applicable to national banks." *See* 69 Fed.Reg.1904, 1907 (Jan. 13, 2004), recognizing 12 U.S.C. 24 as the principal source of Federal authority justifying the preemption of State laws that would inhibit national banks from exercising that authority. Unlike other sections of RCAL *(see* CL §§ 12–504–12–506), § 12–503(e) does not purport to regulate or limit interest rates. The coalescence of §§ 12–503(e), 12–512, and 12–513 would thus seem to interfere more with the broad exercise of a national bank's Federally authorized lending powers than with the rate of interest that can be charged under § 85. *Compare* 15 U.S.C. § 1610, which is part of the Federal Truth In Lending Act. We have avoided addressing the preemption argument because (1) it is not necessary to do so, and (2) if we addressed the limited issue actually raised by Pasadena, we might end up with the wrong answer.

obtain the buyer's signature; § 12–512, which precludes a waiver by the buyer of any protection afforded by RCAL; and § 12–513(a), providing that if a holder violates any provision of the subtitle, no holder may collect or receive any finance charge from the buyer.

Undisputedly, the Agreement states that the terms and enforcement of the Agreement shall be governed by Federal law and the law of South Dakota. No one has claimed that there is any Federal law that would require Maryland law to be applied; indeed, in urging its preemption defense, Pasadena insists that Federal law requires application of South Dakota law. The relevant South Dakota law is S.D. Codified Laws, § 54–11–9 (2006):

> "The use of an accepted credit card or the issuance of a credit card agreement and the expiration of thirty days from the date of issuance without written notice from a card holder to cancel the account creates a binding contract between the card holder and the card issuer with reference to any accepted credit card, and any charges made with the authorization of the primary card holder."

Under South Dakota law, therefore, there is no requirement that the holder sign an agreement or that the issuer attempt to obtain the holder's signature. If, as clearly occurred here, the holder accepts and uses the card to charge purchases, a binding contract exists. The issue we address, then, is whether, in light of the cited sections of RCAL, the choice of law provision in the credit card agreement is valid and enforceable.

With limited exceptions, this Court has long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied by the court. The Court first reached that conclusion in *Williams v. N.Y. Life Ins. Co.*, 122 Md. 141, 147, 89 A. 97, 99 (1913), where we held that "it was perfectly competent" for the parties to a contract made in Maryland to provide that

the contract was to be construed in accordance with New York law. Sixty-seven years later, in *Kronovet v. Lipchin,* 288 Md. 30, 43, 415 A.2d 1096, 1104 (1980), we confirmed that "[i]t is now generally accepted that the parties to a contract may agree as to the law which will govern their transactions, *even as to issues going to the validity of the contract."* (Emphasis added). Citing *Kronovet,* we reconfirmed that principle more recently in *National Glass v. J.C. Penney,* 336 Md. 606, 610, 650 A.2d 246, 248 (1994).

In both *Kronovet* and *National Glass,* the Court looked to *Restatement (Second) of Conflict of Laws,* § 187 as a proper statement of that principle and the exceptions to it. Like Caesar's perception of Gaul, that section of the *Restatement* is in three parts, two of which are relevant here. Section 187(1) is particularly applicable when only one State has an interest in the parties or the transaction but the parties choose to have the law of another State apply. That was the situation in *Williams*—a Maryland contract in which the parties chose to have New York law apply. Section 187(1) provides:

"The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."

The Comment to that subsection explains that the subsection is not really a choice of law provision but one dealing with incorporation by reference. The parties may spell out the specific terms of the contract or, if they choose, incorporate extrinsic material by reference, including provisions of foreign law. If they do the latter, the forum State will apply the applicable provisions of the chosen foreign law with respect to any issue that the parties could have provided for expressly. The importance of this provision, the Comment adds, lies in the fact that "most rules of contract law are designed to fill gaps in a contract which the parties themselves could have filled with express provisions," including rules relating to construction, conditions, performance, frustration, and impossibility. The nature of the limitation stated in subsection (1)—

that the foreign law will be applied only to issues that the parties could have resolved expressly—becomes clear from the Illustrations given by the authors. Parties making a contract in State X cannot include in it a term that would be unlawful in State X, and, accordingly, they may not incorporate by reference the law of another State that has no interest in the contract that would produce that result.[2]

Section 187(2), which applies where more than one State has an interest in the parties or the transaction, is the one more relevant to the case at hand. Subsection (2) provides:

> "The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." [3]

---

**2.** Two Illustrations are given, both involving a trust created in State X in which no other State has any interest. In State X, the highest permissible rate of trustees' commissions is 5%; in State Y, the highest permissible rate is 4%. The trust may provide for commissions to be paid under the law of State Y, because they could have provided expressly for a 4% commission. In the reverse situation, however, where the highest permissible rate in State X is 4% and the highest permissible rate in State Y is 5%, effect would not be given to a provision allowing commissions in accordance with the law of State Y, because (1) State Y has no connection with the trust, and (2) the parties could not have provided for more than 4% under the law of State X.

**3.** Our adherence to § 187(2) is tempered by the fact that Maryland has not adopted the "most significant relationship" test stated in § 188 of the Restatement (Second) but has maintained its allegiance to the *lex loci contractus* principle. *See* discussion in *Motorists Ins. Co. v. ARTRA*

Subject to the two exceptions noted, this subsection is broader, as it provides for the application of the chosen law even as to matters which the parties could *not* have resolved by explicit provision, and that is critical here. The Comment to subsection (2) points out that the rule enunciated there applies only when two or more States have an interest in the determination of the particular issue, but, subject to that qualification, "the rule of this Subsection applies when it is sought to have the chosen law determine issues which the parties could not have determined by explicit agreement directed to the particular issue," and it gives as examples questions "involving capacity, formalities and substantial validity." The Comment adds:

> "[A person] cannot dispense with formal requirements, such as that of a writing, by agreeing with the other party that the contract shall be binding without them. Nor can he by a similar device avoid issues of substantial validity, such as whether the contract is illegal. *Usually, however, the local law of the state chosen by the parties will be applied to regulate matters of this sort. And it will usually be applied even when to do so would require disregard of some local provision of the state which would otherwise be the state of the applicable law.*"

(Emphasis added).

In stating its rationale for this expansive principle, the Restatement notes that the prime objectives of contract law "are to protect the justified expectations of the parties" and provide a measure of certainty as to their rights and liabilities, and it concludes that "[t]hese objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby." This power of choice, the authors continue, "is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations." The *Restatement*

---

*Group, Inc.,* 338 Md. 560, 659 A.2d 1295 (1995). That does not affect our adherence generally to § 187(2).

acknowledges that Section 187(2) may permit the parties to "escape prohibitions prevailing in the state which would otherwise be the state of the applicable law," but responds that "the demands of certainty, predictability and convenience dictate that, subject to some limitations, the parties should have power to choose the applicable law."

Unquestionably, the broad principle stated in § 187(2) is applicable. The issue thus comes down to whether either of the two exceptions to it apply, and our answer is "no." As to the first, there can be little doubt that South Dakota has a substantial relationship to the parties and the transaction. It is the home State of Citibank, and it is the State whence Citibank credit cards are issued, including the card that was issued to Jackson. The transaction at issue is the credit card agreement, not the myriad of purchases made by Jackson, and, as the home State of the credit card issuer, surely South Dakota has a substantial interest in assuring that the form and substance of the agreement that governs the rights and liabilities of the corporation it chartered are consistent with its law. The real question, then, is whether application of South Dakota law would contravene a "fundamental policy" of the State of Maryland, and the answer to that turns on whether the requirement in CL § 12–503(e) that either a credit card agreement be signed by the buyer or that the issuer make an attempt to obtain the buyer's signature constitutes such a "fundamental policy" of the State.

In *National Glass v. J.C. Penney, supra,* 336 Md. 606, 613, n. 4, 650 A.2d 246, 250, n. 4, we observed that the "fundamental policy" exception in § 187(2) of the *Restatement* is analogous to the *lex loci contractus* principle that requires a strong public policy to override application of the law of the place where the contract was made. It follows, then, that our *lex loci contractus* jurisprudence is relevant and informative in examining the "fundamental policy" exception in § 187(2). That is important, because most of the cases in which this issue has surfaced have been lex loci contractus cases, in which there has been no choice of law provision.

The early articulation of the rule was that courts would "always look to the *lex loci,* to give construction to an instrument, and will impart to it validity, according to those laws, unless it would be dangerous, against public policy, or of immoral tendency to enforce it here." *See Trasher v. Everhart,* 3 G. & J. 234, 244 (1831); *Union Trust Co. v. Knabe,* 122 Md. 584, 608, 89 A. 1106, 1115 (1914); *Traylor v. Grafton,* 273 Md. 649, 660, 332 A.2d 651, 659 (1975). In *Bethlehem Steel v. G.C. Zarnas & Co.,* 304 Md. 183, 189, 498 A.2d 605, 608 (1985), we observed that "merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy," and that, to be unenforceable under the public policy exception, "there must be 'a strong public policy against its enforcement in Maryland,' " quoting from *Texaco v. Vanden Bosche,* 242 Md. 334, 340–41, 219 A.2d 80, 83 (1966).

In *Bethlehem Steel,* we had before us a Pennsylvania indemnity contract that called for the indemnitor to indemnify the indemnitee for liability arising from the indemnitee's sole negligence. Such a provision was lawful in Pennsylvania, but not in Maryland, and the question arose whether it was enforceable in a Maryland court. In holding that it was not, we took note that the General Assembly had addressed the specific issue and, by statute, declared that such provisions were "void and unenforceable." We observed also that Pennsylvania seemed to have no strong public policy to the contrary but merely tolerated such a provision. On balance, we found the Maryland public policy sufficiently strong in comparison to that of Pennsylvania to justify overriding application of *lex loci contractus.* A similar situation, with like result, was presented in *National Glass v. J.C. Penney, supra,* 336 Md. 606, 650 A.2d 246. In the face of a Maryland statute absolutely prohibiting an executory contract from requiring a subcontractor to waive its right to a mechanic's lien and declaring any provision to that effect void, we refused to enforce such a waiver, notwithstanding a choice of law clause purporting to apply Pennsylvania law, which allowed the waiver.

In *Kramer v. Bally's Park Place*, 311 Md. 387, 535 A.2d 466 (1988), applying the same principles, we reached a different result. At issue there was whether a gambling debt contracted in New Jersey, where it was lawful, was enforceable in Maryland, where gambling debts had long been held to be unenforceable. In holding that the New Jersey debt would be enforced here, the Court considered the fact that the earlier public abhorrence of gambling had softened considerably, noting not only the allowance of public gambling activities by various charitable and religious organizations under license from a county but the fact that the State itself was heavily into that business through the State lottery. Although private unlicensed gambling remained unlawful and actions to recover illegal gambling debts were not allowed in Maryland, the local public policy was not sufficiently strong to justify overriding *lex loci contractus*.

Evolving public policy was at play as well in *Kronovet v. Lipchin, supra*, 288 Md. 30, 415 A.2d 1096, which did involve a choice of law provision. The contract at issue was a note signed by Maryland residents, secured by a deed of trust on property in Maryland. The agreement was negotiated and made in New York but called for Maryland law to apply with respect to the interest on the note. The rate of interest exceeded the then-lawful rate allowed in New York but was permissible in Maryland. In upholding the contractual choice of Maryland law, the Court looked to the fact that there was a substantial Maryland connection to the transaction but, in considering the public policy exception in *Restatement*, § 187(2) noted that, subsequent to the making of the contract, the New York law was amended to remove the ceiling on interest with respect to that kind of loan, indicating that the policy in effect when the loan was made was "not a fundamental one." *Id.* at 47, 415 A.2d at 1106.

A similar kind of analysis demonstrates that the requirement of CL § 12–503(e) does not represent a fundamental public policy sufficient to forsake the parties' choice of South Dakota law. That analysis must take account of the historical development of bank-issued credit cards.

Until the early 1960s, consumer credit was predominantly in the form or either direct bank or finance company loans or payment plans offered by major retailers to customers seeking to buy goods on credit. Although travel and entertainment cards, such as Diner's Club, Carte Blanche, and American Express, were available, they were more in the nature of "charge cards" rather than credit cards, as the balance on those cards was due in full at the end of the month.

The advent of bank-issued credit cards, such as Visa and MasterCard, began in earnest in the 1960s, but they did not become generally available until the late 1970s. The Supreme Court's decision in *Marquette Nat'l. Bank v. First of Omaha Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), which freed national bank credit card operations from the polyglot of State usury regulations, is often regarded as a major impetus for the spread of those cards, for it made the extension of credit on them much more profitable. Following that decision, national banks began to create subsidiaries in States such as South Dakota and Delaware, which had very liberal usury and credit laws, and offer credit cards nationally that carried the rates of interest that were allowed in those home States. *See The Myth of the Rational Borrower*, 84 Tex. L.Rev. 1481 (2006); Seduction by Plastic, 98 Nw. U.L.Rev. 1373 (2004); *Symposium: Homo Economicus, Homo Myopicus, and the Law and Economics of Consumer Choice*, 73 U. Chi. L.Rev. 63 (2006). The legislative responses in Maryland must be viewed in light of that development.

When RCAL was first enacted in 1967 (1967 Md. Laws, ch. 389), it regulated only transactions and agreements between buyers and sellers for the retail sale of goods and services, pursuant to which the seller established a "time sale price." The law, which was part of a general overhaul of the Retail Installment Sales Act, provided for the establishment of a retail credit account by a seller for the buyer and anticipated an application form that had to contain certain information. The law did not apply to the extension of credit by financial institutions and made no reference to credit cards.

In 1969, the Legislature enacted two laws dealing with credit cards that, in one respect relevant here, seem to be inconsistent. By 1969 Md. Laws, ch. 496, RCAL was broadened to include within the definition of "retail credit account" credit card financing by a financial institution, and, as part of that law, the predecessor to CL § 12–503(e) was enacted, requiring that the agreement be in writing and that "a reasonable attempt" be made to obtain the buyer's signature to that agreement. 1969 Md. Laws, ch. 252 added a provision to the Consumer Protection Act intended to allocate the risk of loss of a credit card. As now codified in CL § 14–1305(a), it states:

> "Except [for a replacement or renewal card] if a credit card or card of identification for credit is issued to a person without his prior request or application, the card is not considered accepted until he signifies acceptance in writing *or uses it to obtain credit.*"

(Emphasis added).

Section 14–1305(b) goes on to provide that, until an unrequested card is accepted, the issuer assumes the risk of its loss, theft, or unauthorized use. That statute assumes the prospect of a credit card being accepted and used without a prior request or application, and thus without the holder's signature. Inferentially, it assumes that, once the card *is* accepted, the risk of loss is on the holder, and that suggests that an unrequested card may be valid even without the holder's signature on an application or agreement.

In 1983, the Legislature enacted a new set of Credit Grantor Revolving Credit Provisions, now codified as CL §§ 12–901 through 12–924. Section 12–902 permits a credit grantor to offer and extend credit under a revolving credit plan, which § 12–901(*l*) defines in a manner that would include bank-issued credit cards.[4]

---

**4.** CL § 12–901(*l*) defines a "revolving credit plan" as:

"a plan that contemplates the extension of credit under an account governed by an agreement between a credit grantor and a borrower under which:

Shortly after enactment of the 1983 law, the Commissioner of Consumer Credit requested an opinion of the Attorney General as to whether, among other things, the revolving credit plan established under the new law was required to be in writing and signed by the borrower. In 68 Op. Att'y. Gen. 206 (1983), the Attorney General responded that, although a new account must be in writing, "it need not be signed by the borrower if acceptance is otherwise evidenced." *Id.* at 207. He explained that, although the statute anticipates a written agreement, "the statutory references to such an agreement would not appear to require the signature of the borrower as the only means of acceptance," and he went on to conclude:

> "When it enacted Subtitle 9, the General Assembly appears to have intended to deregulate the granting of open-end credit in part by simplifying previous statutory requirements. Conspicuously absent from Subtitle 9 is the current RCAL requirement that a seller have an agreement 'signed by the buyer' or have made 'a reasonable attempt to obtain the signature of the buyer.' *Cf.* CL § 12–503(e). By omitting such formalities for the establishment of a Subtitle 9 agreement, the General Assembly evidently intended that use of the account or other evidence of acceptance ... could be sufficient to constitute a binding agreement under Subtitle 9."

Finally, in 1989, the Legislature added, as part of the laws dealing with prohibited actions (Maryland Code, title 5, subtitle 4 of the Cts. & Jud. Proc. Article), a provision that a "credit agreement" is not enforceable by way of action or

---

(1) The credit grantor permits the borrower and, if the agreement governing the plan permits, persons acting on behalf of or with authorization from the borrower to make purchases or obtain loans from time to time;

(2) The amounts of purchases and loans are charged to the borrower's account;

(3) The borrower is required to pay the credit grantor the amounts of all purchases and loans charged to the borrower's account under the plan but has the privilege of paying amounts due from time to time as agreed; and

(4) Interest or finance charges may be charged and collected by the credit grantor from time to time on the amounts due under the plan."

defense unless, among other things, it is in writing and is signed by the person against whom its enforcement is sought. *See* Cts. & Jud. Proc. Art. § 5–408(b). Although § 5–408(a)(2) defines "credit agreement" broadly as including an agreement by a financial institution to "extend credit," § 5–408(c) limits the section to commercial transactions and expressly excludes from it "credit extended by means of, or in connection with, a credit or charge card."

Consistent with the analysis undertaken in *Kramer* and *Kronovet*, we conclude that, in light of the full legislative approach to this issue, the requirement of CL § 5–103(e) does not represent a fundamental public policy of the State of Maryland sufficient to override recognition of the parties' contractual agreement to have Federal and South Dakota law apply to their agreement. Accordingly, we shall affirm the judgment of the Circuit Court.

JUDGMENT OF CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED, WITH COSTS.

ELDRIDGE, J. concurs in judgment only.