PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HILLARY J. KUNDA,

　　　　*Plaintiff-Appellant,*

　　　　v.

C.R. BARD, INCORPORATED,

　　　　*Defendant-Appellee.*

No. 09-1809

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:08-cv-03008-MJG)

Argued: September 20, 2011

Decided: December 23, 2011

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Motz and Judge Duncan joined.

## COUNSEL

**ARGUED:** Paul F. Evelius, WRIGHT, CONSTABLE & SKEEN, LLP, Baltimore, Maryland, for Appellant. William G. Miossi, WINSTON & STRAWN, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Alia Ornstein, WINSTON & STRAWN, LLP, Washington, D.C., for Appellee.

**OPINION**

GREGORY, Circuit Judge:

Hillary Kunda brought suit against her former employer, C.R. Bard, Inc. ("Bard"), alleging that Bard violated Maryland law when at the time of her termination, it failed to pay her for unvested shares earned through the company's long-term profit sharing plan. She argued that despite a New Jersey choice-of-law provision in the plan agreement, Maryland law applies to the contract because the Maryland Wage Payment and Collection Law ("MWPCL") constitutes a fundamental Maryland public policy.

The district court granted Bard's motion to dismiss for failure to state a claim on which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The court found that New Jersey law applies to the contract because the MWPCL is not a fundamental public policy of Maryland and that the unvested shares are not wages under New Jersey law. Furthermore, the court held that even if Maryland law applied, the unvested shares are not wages under the MWPCL and thus were never owed to Kunda. As explained below, we affirm the district court's decision.

I.

Bard, a New Jersey corporation, hired Kunda, a Maryland resident, as a sales representative and at-will employee in 2001. When hired, Kunda's compensation included a $1,500 semi-monthly salary, commissions, and other fringe benefits.

In 2003, Bard implemented the "Bard Optimum Program," an "equity based long-term incentive program for top performing sales representatives," in order to recruit and retain top talent by offering an "opportunity to defer bonus and commission awards on a pre-tax basis." The plan contained a New Jersey choice-of-law provision.

Participation in the Optimum Program was entirely elective, with eligibility determined on a yearly basis. To be eligible, sales representatives had to meet certain criteria, including ranking among the top 50 percent of the domestic sales force and maintaining a fully satisfactory performance rating for the year.

By electing to participate in the Optimum Program, eligible sales representatives deferred part of their compensation in return for fully vested Elective Units, which could be redeemed for a number of restricted shares of Bard's stock determined by the stock price on the date of issuance. Moreover, Bard would match each Elective Unit with two, three, or four unvested Premium Units, also determined by the stock price on the date of issuance.[1] A participant's right to fully *vested* Premium Units depended on continued employment with Bard for a seven-year vesting period after issuance of the *unvested* Premium Units. The Premium Units would not vest if the employee no longer worked for Bard at the end of the vesting period except in cases of death, permanent disability, or retirement.

Kunda participated in the Optimum Program for the calendar years of 2002, 2003, and 2005; she received four Premium Units per Elective Unit in 2002 and two Premium Units per Elective Unit in 2003 and 2005. In 2008, Bard terminated Kunda's employment without cause. Apart from certain Premium Units from 2002 that Bard vested in Kunda on an accelerated schedule, Kunda's Premium Units were unvested at the time of termination, and Bard deemed Kunda's Premium Units forfeited.

---

[1]The number of Premium Units received depended on the employee's performance. Employees in the top 10% of their division would receive four Premium Units per one Elective Unit; the top 11-25% would receive three Premium Units per one Elective Unit; and employees in the top 26-50% would receive two Premium Units per one Elective Unit.

Kunda brought suit against Bard in the United States District Court of Maryland, claiming that she was entitled to the remaining vested Premium Units not given to her upon termination. The district court granted Bard's motion to dismiss pursuant to Rule 12(b)(6). First, the court held that New Jersey law, and not Maryland law, applied. Second, the court held that Kunda had failed to state a valid claim under the New Jersey Wage Payment Law ("NJWPL") or any other New Jersey law. Third, the court found that even if Maryland law applied, Kunda had no claim under the MWPCL.

## II.

We review Bard's motion to dismiss under Rule 12(b)(6) de novo. *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009). In doing so, we "must accept as true all of the factual allegations contained in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). In order to survive Bard's motion, Kunda's complaint must contain sufficient factual allegations, which accepted as true, "state a claim to relief that is plausible on its face." *Id.* at 570. Therefore, we may only grant Bard's motion where "it appears beyond doubt [Kunda] can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## III.

### A.

Kunda first challenges the district court's finding that New Jersey law, and not Maryland law, applies. Despite the New Jersey choice-of-law provision within the Optimum Program agreement, Kunda argues that the Maryland law should apply here because the MWPCL is a fundamental Maryland public policy. We find her argument unpersuasive and agree with the district court that New Jersey law applies.

Under Maryland law, § 187 of the *Second Restatement of Conflict of Laws* governs the determination of whether Maryland or New Jersey law applies. *See Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803-05 (Md. 2007); *see also Kronovet v. Lipchin*, 415 A.2d 1096, 1104-06 (Md. 1980) (quoting RESTATEMENT (SECOND) CONFLICT OF LAWS § 187 (1971)); *Taylor v. Lotus Dev. Corp.*, 906 F. Supp. 290, 297-98 (D. Md. 1995). "The law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless:

> (a)  the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b)  application of the law of the chosen state would be contrary to a fundamental policy of a state which has materially greater interest than the chosen state in the determination of the particular issue and which [otherwise] would be the state of applicable law in the absence of an effective choice of law by the parties.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 187(2)(a),(b) (1971).

As we have previously stated, "not every statutory provision constitutes a fundamental policy of a state." *Volvo Constr. Equip. of N. Amer., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 607 (4th Cir. 2004). "Merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy and thus unenforceable in [Maryland] courts." *Bethlehem Steel v. G.C. Varnas & Co.*, 498 A.2d 605, 608 (Md. 1985). Moreover, "there is a heavy burden on [the party] who urges rejection of foreign law on the ground of public policy." *Harford Mut. v. Bruchey*, 238 A.2d 115, 117-18 (Md. 1968).

"No Maryland state court has yet evaluated whether the MWPCL embodies such a strong public policy." *Sedghi v. Patchlink Corp.*, No. 07-1636, 2010 WL 3895472, at \*4 (D. Md. Sept. 30, 2010). However, Maryland district courts, including the district court in this case, have thrice held that "the Wage Law does not appear to represent a fundamental policy of the state of Maryland" for the purpose of choice of law analysis. *Taylor*, 905 F. Supp. at 298; *c.f. Sedghi*, 2010 WL 2895472, at \*4; *Yeibo v. E-Park of D.C., Inc.*, No. 2007-1919, 2008 WL 182502, at \*4 (D. Md. Jan. 18, 2008).

Maryland state courts have struck down contractual provisions contrary to a fundamental public policy in cases where the related statute contains an express statement that the law is a fundamental public policy, an anti-waiver provision, or similar language of clear legislative intent. Thus, in *Bethlehem Steel*, the Maryland Court of Appeals refused to uphold the provision of a Pennsylvania contract that indemnified for negligence because doing so would violate a fundamental Maryland public policy. 498 A.2d at 611. The Maryland General Assembly "specifically addressed [such] clauses in construction contracts . . . and has unequivocally told the Maryland judiciary that such a clause 'is void and unenforceable.'" *Id.* at 608. Furthermore, in the language of the statute governing indemnity agreements, "the General Assembly expressly stated that such indemnity provision 'is against public policy.'" *Id.*

Similarly, in *National Glass, Inc. v. JC Penny Properties, Inc.*, the Maryland Court of Appeals invalidated a Pennsylvania choice-of-law clause that required a subcontractor to waive its right to a mechanic's lien, a provision that was legal in Pennsylvania but explicitly prohibited by Maryland statute. 650 A.2d 246, 247-48, 251 (Md. 1994). The court held that honoring the contract's choice of law would violate a fundamental Maryland public policy because the relevant Maryland statute stated that "[a]ny provision of a contract made in vio-

lation of this section is *void as against the public policy of this State*." *Id.* at 250 (emphasis added).

In contrast, the MWPCL contains no express language of legislative intent that that law is a fundamental Maryland public policy. Furthermore, the MWPCL contains no language indicating that any contractual terms contrary to its provisions are void and unenforceable, or that any provision of the MWPCL may not be waived by agreement. Thus, we find that the MWPCL is not a fundamental Maryland public policy.

Contrary to Kunda's assertions, the Maryland Court of Appeals' decision in *Medex v. McCabe* fails to show that the MWPCL is a fundamental Maryland public policy and is easily distinguishable. 811 A.2d 297 (Md. 2008). In *Medex*, the court refused to uphold a provision in an employment contract between a Maryland company and Maryland resident requiring continued employment to receive already earned incentive payments. *Id.* at 300. The court noted that the MWPCL's "mandate is clear and complies with [its] public policy," which is "to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages." *Id.* at 304. Additionally, the court stressed that "Maryland is one of forty-two states to enact wage payment laws, and courts across the country have found such laws to be expressions of state public policy." *Id.*

Since the contract was between a Maryland employer and a Maryland employee, the question of whether the contract was enforceable in *Medex* depended upon whether the provision in question was contrary to Maryland public policy. Here, with a contract between a Maryland employee and New Jersey employer, the test is not merely whether enforcement of the contract violates Maryland public policy, but rather a *fundamental* Maryland public policy, requiring a higher standard of scrutiny. The *Medex* court neither indicated how strong the public policy behind the MWPCL is nor attempted to determine whether the policy was fundamental. Moreover,

the fact that forty-two other states, including New Jersey, have enacted similar wage payment laws undermines the notion that the MWPCL is a fundamental public policy. The availability of comparable, albeit different, legislation in different states demonstrates that protection under the MWPCL is unnecessary where there is a substitute, as there is here. Kunda essentially asks us to apply Maryland law here, not because New Jersey law offers inadequate protection, but rather because Maryland law is more favorable. We decline to do so.

Furthermore, Kunda's contention that *Medex* effectively disavowed *Taylor*, which was decided nearly ten years before *Medex*, is unfounded. In *Medex*, the Maryland Court of Appeals had the opportunity to declare the MWPCL a fundamental Maryland public policy and explicitly overrule the Maryland district court's decision in *Taylor*, of which it was well aware, and yet it declined to make such a decision. Moreover, even after *Medex*, courts have affirmed *Taylor* and continued to hold that the MWPCL is not a fundamental Maryland public policy. *See e.g.*, *Sedghi*, 2010 WL 2895472, at *4; *Yeibo*, 2008 WL 182502, at *5-6.

However, well-established Maryland law does provide that "parties to a contract may agree to the law which will govern their transaction, even as to an issue going to the validity of the contract." *Kronovet*, 415 A.2d at 1104. The Maryland Court of Appeals has long recognized "the ability of contracting parties to specify in their contract that the laws of a particular state will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied." *Jackson*, 921 A.2d at 803. Here, Kunda fails to present justification substantial to overcome Maryland's presumption in favor of the freedom to contract.

Because the MWPCL contains no language or legislative intent indicating that it represents a fundamental public policy

of Maryland and because no Maryland court has ever ruled that it is, we affirm the district court's holding that the choice-of-law provision must be upheld and New Jersey law applies.[2]

B.

Kunda next argues that even if New Jersey law applies here, the district court wrongly held that the Optimum Program's forfeiture provisions were triggered when she was fired without cause. We cannot agree.

The NJWPL requires that "every employer shall pay the full amount of wages due his employees." N.J. STAT. ANN. § 34:11-4.2 (2011). However, the law explicitly excludes "any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." *Id.* § 34:11-4.1. New Jersey defines wages only as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis." *Id.* Any Premium Units Kunda might receive through the Optimum Program were incentives for her to continue her employment at Bard, and not simply payment for the sales she completed. Accordingly, as the Premium Units are outside New Jersey's definition of wages, Kunda has no claim under the NJWPL and must instead seek a common law remedy.

Relying on the opinion of the New Jersey Superior Court in *Rosen v. Smith Barney, Inc.*, Kunda argues that the Optimum Program's forfeiture clause is unreasonable, and thus is inapplicable and invalid in two ways. 925 A.2d 32 (N.J.

---

[2]If Maryland law had applied here, Kunda would have no claim under the MWPCL. Maryland law defines wages as "any renumeration . . . that is promised in exchange for the employee's work." *Whiting Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671 (Md. 2001) (citing MD. CODE ANN., LAB. & EMPL. § 3-501 (2011)). Bard promised Kunda *unvested* Premium Units to incentivize her to continue her employment, not *vested* Premium Units in exchange for meeting sales criteria.

Super. Ct. App. Div. 2007), *aff'd*, 950 A.2d 205 (N.J. 2008). She first contends that the factors present in *Rosen* which rendered the forfeiture provision reasonable and enforceable are not present here. Second, Kunda argues that because she was terminated without cause, the Optimum Program is not reasonably designed to achieve the intended purpose. Given the highly similar facts to *Rosen*, we find Kunda's arguments unpersuasive.

In *Rosen*, Smith Barney instituted a Capital Accumulation Plan ("CAP") in order to attract and retain quality employees and combat widespread broker turnover. 925 A.2d at 34. Brokers who chose to participate in CAP diverted a portion of their money to Smith Barney, who then used those funds to purchase restricted stock in its parent company, Citigroup, at a substantial discount. *Id.* However, ownership of the restricted stock only vested after a two-year period; during that period, brokers retained an unvested interest in the stock. *Id.* at 35. Brokers who resigned voluntarily or were terminated for cause during the vesting period forfeited all unvested interest. *Id.*

Emphasizing that "public policy strongly favors freedom to contract," the court in *Rosen* held that "enforceability of a forfeiture provision is judged against the standard of reasonableness, with due regard for the consideration that the court's equitable jurisdiction to permit relief from a forfeiture clause must not ignore the parties' legal rights to bind themselves to specific contract terms." 925 A.2d at 41. The court upheld the CAP forfeiture provision because it was a reasonable means, when considered against the background circumstances, of achieving the program's goal — retaining quality brokers and combating high turnover. *Id.* at 42. The court held the forfeiture provision was reasonable and enforceable because (1) "the contract [was] in writing and all terms [were] fully disclosed prior to any participant enrolling"; (2) "the risk of forfeiture [was] unambiguously disclosed"; (3) "the period of delay for absolute ownership [was] neither onerous nor unrea-

sonable"; and (4) the plaintiffs "freely, willfully, and knowledgably consented." *Id.*

Since the Optimum Program also satisfies the same criteria used by the court in *Rosen*, we find that the forfeiture clause is both reasonable and enforceable. Kunda received ample written documentation relating to the program prior to participation, including a prospectus. Furthermore, the risk of forfeiture was clearly and repeatedly disclosed in all literature sent to Kunda. The seven-year vesting period is not unreasonable or onerous, and was in fact accelerated, as evidenced by the fact that some of Kunda's Premium Units granted in 2003 had already vested by the time of her termination in 2008. Thus, we hold that the forfeiture clause is both enforceable and reasonable, and accordingly find that Kunda has no claim under New Jersey law.

Kunda unsuccessfully attempts to distinguish *Rosen* on the grounds that Bard terminated her without cause rather than her resigning voluntarily. She argues that where termination without cause occurs, the forfeiture clause is not reasonably designed to accomplish its purpose, but actually achieves the opposite of the stated purpose, and therefore is unreasonable and unenforceable. We disagree.

The stated purpose of the plan is "to provide an equity-based, long-term incentive program for top performing sales representatives" in order to "attract and retain the services of valuable employees." By allowing exceptional employees to "defer bonus and commission awards on a pre-tax basis," the Optimum Program clearly encourages the recruitment and retention of highly performing employees. Furthermore, the seven-year forfeiture period incentivizes employees to stay with Bard to receive vested Premium Units. That Bard chose to terminate Kunda when it no longer found her useful to the company demonstrates that the Optimum Program reasonably accomplishes its purpose. Bard always intended the Optimum Program would benefit itself, and not the employee, by entic-

ing valuable employees not to exercise their right as an at-will employee to leave for another opportunity. Therefore, we find that the forfeiture clause is reasonably designed to accomplish its purpose, the retention of high-performing Bard employees.

Kunda does correctly assert that forfeiture of unvested Premium units when an employee is terminated without cause *can* create a potential for abuse. However, potential alone does not render the forfeiture clause unreasonable or unenforceable.

Typically, New Jersey courts refuse to enforce forfeiture provisions of employee incentive payments only where forfeiture violates public policy or creates inequity. *See Mulford v. Computer Leasing, Inc.*, 759 A.2d 887, 890 (N.J. Super. Ct. Law Div. 1999) (invalidating forfeiture of incentives which employee already earned through past performance); *Ellis v. Lionikis*, 310 A.2d 527, 531-33 (N.J. Super. Ct. Law Div. 1977) (refusing to enforce a forfeiture provision violating public policy and ERISA); *Gaines v. Monroe Calculating Mach. Co.*, 188 A.2d 179, 185-86 (N.J. Super. Ct. App. Div. 1963) (holding that neither voluntary nor involuntary termination triggered forfeiture of stock options which employer promised in exchange for five years of employment and guaranteed against cancellation). Kunda cannot show that Bard terminates employees without cause in order to avoid paying unvested incentives. Moreover, as the court in *Rosen* noted, "[a]lthough the forfeiture clause may be an inhibitive influence on an employee's decision whether to accept a new job," it is not "unreasonable or invalid." 925 A.2d at 42.

As we find that the Optimum Program's forfeiture clause is reasonable and enforceable, Kunda has no viable claim against Bard under New Jersey law. We therefore affirm the district court's grant of Bard's motion to dismiss.

## C.

Finally, Bard's contention that Kunda's state law claims are preempted by ERISA is unfounded, even if the Optimum Pro-

gram is an ERISA covered plan. ERISA's requirement that administrative remedies be exhausted is unnecessary if there is "clear and positive" evidence that the remedies are futile or useless. *E.g.*, *Markar v. Health Care Corp. of the Mid-Atl.*, 872 F.2d 80, 83 (4th Cir. 1989). Kunda does not claim she has been denied a right or benefit under the Optimum Program, but rather alleges that the Optimum Program's forfeiture provision violates both New Jersey and Maryland law. Accordingly, because her "suit is directed to the legality of a plan, not to a mere interpretation of it, exhaustion of the plan's administrative remedies would be futile." *Durand v. Hanover Ins. Co.*, 560 F.3d 436, 439-40 (6th Cir. 2009).

## IV.

We cannot hold, as Kunda advocates, that her *unvested* Premium Units are converted into wages in the limited situation where an employee is terminated without cause. Thus, we affirm the district court's grant of Bard's motion to dismiss.

*AFFIRMED*