57 A.3d 521

Anthony FALLS

v.

1CI, INC, et al.

No. 02747, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Dec. 19, 2012.

The page number 644 appears in the top margin with redacted black bars covering the rest of the page content.

Meredith S. Campbell (Christine P. Hsu, Shulman, Rogers, Gandal, Pordy & Ecker, PA, on the brief) Potomac, MD, for appellant.

Daniel M. Press (Angela L. Hart, Chung & Press, PC, on the brief) McLean, VA, for appellee.

Panel: EYLER, JAMES R.,* HOTTEN, JAMES P. SALMON (Retired, Specially Assigned), JJ.

JAMES P. SALMON (Retired, Specially Assigned), J.

This case requires us to examine the breadth of an arbitration agreement and to consider whether the agreement to arbitrate was unconscionable.

At the beginning of 2009, Anthony Falls ("Falls") was an employee of 1CI, Inc., a wholly owned subsidiary of Cape Fox Corporation ("Cape Fox"). At all times when Falls was employed as the CEO of 1CI, he worked out of the 1CI's

* Eyler, James R., J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of the Court.

Gaithersburg, Maryland office. 1CI is a Delaware Corporation. Cape Fox is an Alaskan Native Corporation and serves as a holding company for several subsidiary corporations. The principal office of Cape Fox is located in Saxman, Alaska.[1]

On January 1, 2009, Falls signed an employment agreement (the "Agreement") with 1CI. The Agreement provided that Falls would serve as Chief Executive Officer ("CEO") of 1CI and would be paid $120,000 annually. In addition, under the Agreement, Falls was entitled to an incentive bonus equal to "40% of the sum total of [1CI's] profits before taxes but after payment of" compensation to Falls. The Agreement provided that "[a]ny dispute, claim, or controversy arising out of or relating to this Agreement shall be settled by arbitration by a single arbitrator." In the event that the parties could not mutually agree on an arbitrator, an arbitrator would be selected from a list provided by the Seattle Washington office of JAMS (Judicial Arbitration & Mediation Services, Inc.). Also, the parties agreed that the arbitration hearing would take place in Seattle, Washington, that arbitration fees would be divided 50–50 between the parties and, that the law of Alaska would govern the resolution of all disputes. In addition, according to the Agreement, the decision of the arbitrator would be "final, binding, and non appealable." Lastly, the Agreement provided that if any court of competent jurisdiction were to hold that any provision of the Agreement was "invalid, unenforceable, or void" the remaining provisions would remain "in full force and effect."

Falls's employment with 1CI was terminated in January 2010. Approximately six months later, Falls filed suit in the Circuit Court for Montgomery County against 1CI and Cape Fox. In his one count complaint, Falls alleged: 1) that the defendants were employers within the meaning of the Maryland Wage Payment and Collection Law as codified in Mary-

---

1. Saxman, Alaska is located approximately two miles south of Ketchikan, Alaska, which is, in turn, in the southeast portion of that state. A flight from Ketchikan, Alaska to Seattle, Washington takes approximately ninety minutes.

land Code (2008 Repl. Volume), Labor & Employment Article ["LE"], Section 3-501 through 3-509 (hereinafter "the MWPCL"); 2) that his employers had failed to pay him the 40% bonus he was entitled to under the Agreement; 3) that the defendants had no legitimate reason for not paying him his bonus; and 4) as of December 31, 2009, he was owed a bonus "in excess of $400,000." Invoking Section 3-507.1 of the MWPCL, Falls asked the court to award him treble damages [i.e. three times the amount of the bonus due] plus attorney's fees and costs.

1CI filed a "motion to dismiss [the Complaint] and/or to compel arbitration," which Falls opposed. Cape Fox filed a separate motion to dismiss the complaint based on its assertion that the Circuit Court for Montgomery County did not have personal jurisdiction over it. The Circuit Court, after considering Falls's opposition, denied Cape Fox's motion to dismiss insofar as the motion was based on the allegation of no personal jurisdiction. The Court, however, ordered that Falls submit his claims against both 1CI and Cape Fox to arbitration. The judge further ordered that the complaint filed against both defendants be dismissed.[2]

Falls filed a timely appeal from the trial judges decision to order arbitration.[3] He presents four questions for our review:

1. Did the circuit court err in compelling arbitration where Mr. Falls asserted a statutory claim for wages under the Maryland Wage Payment and Collection Law?

---

2. As indicated, Cape Fox was not a party to the Agreement. Nevertheless, counsel for Cape Fox argued, citing *Long v. Silver,* 248 F.3d 309, 320 (2001), *overruled on other grounds, Hertz Corp. v. Friend,* 559 U.S. 77, ——, 130 S.Ct. 1181, 1190–92, 175 L.Ed.2d 1029 (2010) that a non-signatory to an agreement may invoke an arbitration clause under ordinary state-law principles of agency or contract. The *Long* case does stand for that proposition. *See Id.,* note 6. In this appeal, Falls does not challenge the court's ruling that the arbitration provision was applicable to both 1CI and Cape Fox.

3. A trial judge's order to arbitrate a claim is immediately appealable. *Harris v. Bridgford,* 153 Md.App. 193, 201, n. 7, 835 A.2d 253 (2003).

2. Did the circuit court err in compelling arbitration in Seattle, Washington, a forum with no connection to any of the litigants or any interest in enforcing the Maryland Wage Payment and Collection Law?

3. Did the circuit court err in compelling arbitration under the factual circumstances presented, where the arbitration agreement would mandate fee-splitting between the employer and the appellee?

4. Did the circuit court err in compelling arbitration under the factual circumstances presented, where the arbitration agreement provides that the decision would not be judicially appealable?

## I.

### *Background.*

Up until the summer of 2008, Falls was the sole owner and CEO of 1CI. Cape Fox bought 1CI from Falls in August 2008. As part of the purchase agreement, Falls was hired as an employee by Cape Fox to continue to manage and operate 1CI. At the time of the negotiations for the purchase of his company, according to a Declaration later signed by Falls, Cape Fox promised him that he would be entitled to receive incentive compensation, over and above his salary, for acting as 1CI's CEO. Falls began performing work for both the defendants in the fall of 2008.

The Agreement, which was signed in January 2009, was presented to Falls by counsel for Cape Fox and it was Falls's "understanding" that Cape Fox's counsel drafted the agreement. All of Falls's discussions regarding the employment contract were with Cape Fox's counsel. Falls was not represented by an attorney when he negotiated the Agreement.

At the beginning of the Agreement, the following "recital" is found:

A. 1CI is an Alaska Native Corporation—owned Delaware Corporation, owned by Cape Fox Corporation, the ANCSA Village Corporation for the Native Village of Saxman. 1CI

is organized under the laws of the State of Delaware, and is a participant in the SBA 8a business development program[.]

According to the Agreement, 1CI was formed as a for profit corporation to provide construction related services "as a commercial and Government contractor."

Paragraph 10(a) of the Agreement stated:

**Governing Law.** This Agreement shall be governed by and construed according to the laws of the State of Alaska.

The arbitration clause in the Agreement that the trial judge enforced was set forth in paragraph 10b, which reads as follows:

**Arbitration.** Any dispute, claim or controversy arising out of or relating to this Agreement shall be settled by arbitration by a single arbitrator. The parties will attempt to agree on a single arbitrator. If they are unable to do so, the arbitration will be referred to the Seattle, Washington office of Judicial Arbitration & Mediation Services, Inc. (JAMS). That office will provide a list and resumes of available arbitrators, numbering one or more than there are parties. Each party may then strike one name, leaving the remaining as the arbitrator. If more than one name remains, the designated arbitrator shall be selected by the JAMS administrator. Each party shall have the right to conduct discovery proceedings in the manner and within the scope provided for in the Federal Rules of Civil Procedure. The arbitrator shall be authorized to issue subpoenas for the purpose of requiring attendance of witnesses at depositions. At least twenty days before the arbitration, the parties shall exchange lists of all witnesses (including experts) and copies of all exhibits they intend to use at the arbitration. *The arbitration shall take place in Seattle, Washington.* The arbitration shall take place no later than 90 days after the service of the notice of intent to arbitrate, unless extended by mutual agreement. The arbitrator shall have the authority and power to proceed ex parte in the event that either party shall fail, after reasonable notice, to

> attend the arbitration. The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of this Agreement, except that the arbitrator shall have no authority to grant injunctive relief, orders for specific performance or punitive or exemplary damages. The arbitrator shall determine which is the prevailing party and shall determine and include in the award that party's reasonable attorney fees, costs and expert witness expenses as provided in Section 10c. *Each party shall share equally in payment of the costs and fees of the arbitrator. The award rendered by arbitration shall be final, binding and nonappealable.* Judgment upon the award may be entered in any court of competent jurisdiction in the United States.

(Emphasis added).

Paragraph 10c of the Agreement provided:

> **Attorney's fees.** In the event any suit or arbitration proceeding is instituted by one party against the other arising out of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and expenses of litigation or arbitration.

## II.

### *Statutory Background.*

Falls contends that under the Agreement, he did not consent to arbitration of his right to a bonus under the MWPCL. To decide whether Falls is correct, it is useful to review two statutes and the manner in which those statutes have been interpreted, *i.e.*, the Federal Arbitration Act ("the FAA"), which is set forth at 9 U.S.C., § 1 *et. seq.*, and the Maryland Uniform Arbitration Act ("the MUAA"), found in Maryland Code (1974, 2002 Repl. Volume") § 3–201 *et seq.* of the Courts and Judicial Proceedings Article.[4]

---

4. The MUAA applies to employment contracts between an employer and a single employee. *Wilson v. McGrow, Pridgeon & Co. P.A.*, 298 Md. 66, 78, 467 A.2d 1025 (1983). The rule is otherwise, however, if the

In *Walther v. Sovereign Bank,* 386 Md. 412, 872 A.2d 735 (2005), the Court said:

> The FAA applies to nearly all arbitration agreements, and, like all federal law, it preempts inconsistent state law. *See Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 861, 79 L.Ed.2d 1 (1984) (United States Supreme Court stating that, "[i]n creating a substantive rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements") (footnote omitted). Section 2 of the FAA, which the United States Supreme Court has made clear state courts are also bound to recognize and enforce, *see Southland,* 465 U.S. at 14–15, 104 S.Ct. at 860–861, provides that a "written provision ... to settle by arbitration *a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon any grounds at law or in equity for the revocation of any contract.*" 9 U.S.C. § 2. In enforcing § 2 of the FAA, however, state courts are not bound by the federal procedural provisions of the FAA, which are found in §§ 3 and 4 of the FAA, but may generally apply their own procedures. *See Southland,* 465 U.S. at 16 n. 10, 104 S.Ct. at 861 n. 10 (stating that, "[i]n holding that the [FAA] preempts a state law that withdraws the power to enforce arbitration agreements, we do not hold that §§ 3 and 4 of the [FAA] apply to proceedings in State courts") (alterations added). Therefore, in enforcing § 2 of the FAA, we must look to the pertinent Maryland law relating to arbitration agreements to decide whether the circuit court properly ordered petitioners to arbitrate their claims against Sovereign Bank in light of petitioners' assertion that the arbitration agreement itself is invalid in that it is unconscionable and therefore unenforceable.

The Maryland Uniform Arbitration Act ("MUAA") is set forth in Md.Code (1974, 2002 Repl.Vol.) §§ 3–201 et seq. of

---

agreement to arbitrate is contained in a collective bargaining contract. *Id.*

the Courts and Judicial Proceedings Article *and was purposefully meant to mirror the language of the FAA.* In nearly identical language to that found in § 2 of the FAA, the MUAA provides that a *"written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract."* Section 3–206(a) of the Courts and Judicial Proceedings Article. As we stated in *Holmes v. Coverall North America,* 336 Md. 534, 649 A.2d 365 (1994):

"The Maryland Arbitration Act has been called the 'State analogue . . . to the Federal Arbitration Act.' *See Regina v. Envirmech,* 80 Md.App. 662, 667, 565 A.2d 693, 696 (1989). The same policy favoring enforcement of arbitration agreements is present in both our own and the federal acts. Compare *Moses H. Cone Memorial Hospital v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983) (noting the 'liberal federal policy favoring arbitration agreements') *with Gold Coast Mall,* 298 Md. at 103, 468 A.2d at 95 (noting the 'legislative policy favoring enforcement of executory agreements to arbitrate'). *We therefore rely on decisions interpreting the Federal Arbitration Act in reaching our decision."* *Holmes,* 336 Md. at 541, 649 A.2d at 368. Judge Battaglia, for the Court, most recently explained arbitrations favored status in *Cheek v. United Healthcare of the Mid–Atlantic, Inc.,* 378 Md. 139, 835 A.2d 656 (2003);

"We have described arbitration as 'the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them.' *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 103, 468 A.2d 91, 95 (1983); *see also Charles J. Frank, Inc. v. Associated Jewish Charities of Baltimore, Inc.,* 294 Md. 443, 448, 450 A.2d 1304, 1306 (1982). The Maryland Uniform Arbitration Act . . . 'expresses the legislative policy favoring enforcement of agreements to arbitrate.' *Allstate Ins. Co. v. Stinebaugh,*

374 Md. 631, 641, 824 A.2d 87, 93 (2003). *See also Holmes v. Coverall North America, Inc.*, 336 Md. 534, 546, 649 A.2d 365, 371 (1994) (observing that the Arbitration Act embodies 'the legislative intent to favor arbitration'); *Crown Oil & Wax Co. of Delaware, Inc. v. Glen Constr. Co. of Virginia, Inc.*, 320 Md. 546, 558, 578 A.2d 1184, 1189 (1990) ('Maryland courts have consistently stated that the [Arbitration Act] embodies a legislative policy favoring the enforcement of executory agreements to arbitrate.'); *Gold Coast Mall, Inc.*, 298 Md. at 103, 468 A.2d at 95; *Charles J. Frank, Inc.*, 298 [294] Md. at 448, 450 A.2d at 1306." *Cheek*, 378 Md. at 146, 835 A.2d at 660. This public policy favoring such agreements is understandable, as arbitration agreements are generally a less expensive and more expeditious means of settling litigation and relieving docket congestion. *The favorable status which arbitration agreements are afforded in Maryland has been made explicitly evident by the Legislature in the enactment of the MUAA.*

*Id.* at 423–25, 872 A.2d 735. (Emphasis added).

## III.

## *Did the parties agree to arbitrate the MWPCL claim?*

### A. *The Breadth of the Agreement.*

Mindful of the fact that Maryland's public policy favors arbitration of disputes, we analyze Falls's contention that the Agreement did not compel him to arbitrate the issue mentioned in his complaint.[5]

---

5. The Agreement provided that Alaska law should govern. Nevertheless, when discussing the breadth of the arbitration clause in their briefs, neither party refers us to Alaskan law. Instead, both sides appear to presume that the law to be applied does not differ from that enunciated in the Maryland and federal cases. Likewise, in the trial court, the parties seem to have shared the same presumption. We shall also adopt that presumption, because neither party has relied on Alaskan law. *See Doctor's Associates, Inc. v. Erik J. Hamilton,* 150 F.3d 157, 164 (2nd Cir.1998) (stating that defendant had waived his objection to arbitration based on New Jersey law on unconscionability

The MWPCL governs the manner in which Maryland employers pay their employees and provides remedies for an employer's failure to pay an employee all wages owed to him. *Barufaldi v. Ocean City,* 196 Md.App. 1, 27, 7 A.3d 643 (2010). "Wage" is defined in the MWPCL as "all compensation that is due to an employee for employment" and includes bonuses, commissions, fringe benefits, and "any other remuneration promised for service." Labor and Employment Article ["LE"] § 3–501(c). If a court finds that the employer withheld wages from an employee in violation of the MWPCL and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding three times the wage, along with reasonable attorneys' fees and other costs. LE § 3–507.1(b). The bonus mentioned in Falls's Complaint is a "wage" as defined in Labor and Employment Article § 3–501(c).

Falls argues that the arbitration clause contained in the Agreement is "irrelevant" because only "statutory claims are asserted in his complaint." We disagree with Falls in this regard.

There are many cases interpreting the Federal Arbitration Act, which demonstrate that, depending on the language used in the contract, an agreement to arbitrate can include statutory claims. This was made clear in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The *Gilmer* Court said:

> It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Indeed, in recent years we have held enforceable arbitration agreements relating to claims arising under the Sherman Act, 15 U.S.C. §§ 1–7; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.;* and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2). *See Mitsubi-*

---

because, among other things, "[he] failed to bring New Jersey law on unconscionability to the attention of the district court.")

*shi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). In these cases we recognized that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi,* 473 U.S. at 628 [105 S.Ct. 3346].

*Although all statutory claims may not be appropriate for arbitration, having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Ibid.* In this regard, we note that the burden is on Gilmer to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims. *See McMahon,* 482 U.S. at 277 [227, 107 S.Ct. 2332]. If such an intention exists, it will be discoverable in the text of the ADEA [Age Discrimination in Employment Act of 1967], its legislative history, or an "inherent conflict" between arbitration and the ADEA's underlying purposes. *See ibid.* Throughout such an inquiry, *it should be kept in mind that 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.' Moses H. Cone, supra* [460 U.S.] at 24 [103 S.Ct. 927].

(Emphasis added). *See also CompuCredit Corp. v. Greenwood,* 565 U.S. ——, ——, 132 S.Ct. 665, 667, 181 L.Ed.2d 586 (2012). (If a federal statute is silent on whether claims under it can proceed in an arbitration forum, the FAA requires the arbitration agreement to be enforced according to its terms).

As already indicated, the parties agreed that "[a]ny dispute, claim, or controversy arising out of or relating to this agreement shall be settled by arbitration...." The United States Court of Appeals for the Fourth Circuit has characterized similar formulations as "broad arbitration clauses capable of

an expansive reach." *American Recovery Corporation v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 93 (4th Cir.1996). In *American Recovery,* the agreement obligated the parties to arbitrate any dispute that "arose out of or related to" the consulting agreement. *Id.* Because plaintiff's claim "significantly related to the consulting agreement," arbitration was compelled. *Id.* In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 398, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Supreme Court characterized as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement." *See also J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 321 (4th Cir.1988) (same). The arbitration clause here at issue is much broader than clauses found in many contracts. In fact, the "arising out of or relating to" language found in the Agreement is the formulation recommended by the American Arbitration Association. *See Mediterranean Enterprises, Inc. v. Ssangyong,* 708 F.2d 1458, 1464 (9th Cir.1983).

Even aside from the fact that the arbitration language in this case is broad, precedent from Federal Courts, interpreting the FAA, have uniformly held that even ambiguous arbitration clauses must be interpreted in favor of arbitration. In the case of *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Court announced its "healthy regard for the federal policy favoring arbitration" and went on to say that the Federal Arbitration Act "establishes that, as a matter of federal law, any doubts concerning the scope of arbitration issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." More recently, the Fourth Circuit reiterated in *American Recovery Corporation, supra,* that " 'the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.' " 96 F.3d at 92 (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Insurance Co.,* 867 F.2d 809, 812 (4th Cir.1989). *See also Bank Julius Baer*

*& Co., Ltd. v. Waxfield, Ltd.* 424 F.3d 278, 284 (2d Cir.2005), (Broadly worded arbitration agreement creates a presumption of arbitrability that is only overcome if the Agreement is not susceptible to an interpretation that covers the dispute.)

The Fourth Circuit case of *Adkins v. Labor Ready, Inc.*, 303 F.3d 496 (4th Cir.2002) is instructive. The plaintiffs in *Adkins* were employees of a temporary employment agency that provided manual day labor to companies. *Id.* at 499. The plaintiffs contended that they were statutorily entitled to payment for waiting time at their employer's dispatch office, travel time between that office and the assigned work place, and time spent undergoing training. *Id.* The plaintiffs filed suit in federal court alleging that the procedures adopted by their employer violated the Federal Fair Labor Standards Act ("FLSA") and the West Virginia minimum wage and maximum hour standards for employees. *Id.*

The employees had agreed to arbitrate "any disputes arising out of [their] employment, including any claims of discrimination, harassment or wrongful termination that [they] believe [they] have against" their employer, together with an agreement to arbitrate "all other employment related issues...." *Id.* at 500. The plaintiffs argued that either the statutory text the Fair Labor Standard Act directly conflicted with the FAA's pro-arbitration policy *Id.* at 506.[6] The plaintiffs made a similar argument concerning their statutory claim under West Virginia law. *Id.*

Both claims were rejected by the Fourth Circuit. *Id.* at 506–507. The *Adkins* Court concluded that the plaintiffs' "claims amount to little more than an attempt to undermine repeated pronouncements by Congress and the Supreme Court that federal law incorporates a liberal policy favoring arbitration agreements. A refusal on our part to heed these pronouncements would be a dereliction of our duty under law." *Id.See also Holmes v. Coverall North America, Inc.* 336 Md.

---

6. There were some exceptions to the agreement to arbitrate that are not here relevant.

534, 541, 649 A.2d 365 (1994). (We rely on federal cases interpreting the FAA in determining whether a dispute is arbitrable.)

In the case *sub judice,* Falls stresses that in his one count complaint he did not allege a breach of contract, but instead alleged a violation of a statute, *i.e.* the MWPCL. That distinction makes no difference, so long as the arbitration agreement is broad enough to encompass statutory claims. *See Gilmer, supra,* 500 U.S. at 25–26, 111 S.Ct. 1647. The phrase "[a]rising out of or relating to" has been said to include within its ambit "every dispute between the parties having a significant relationship to the contract regardless of the label attached to a dispute." *Wachovia Bank, N.A. v. Schmidt,* 445 F.3d 762, 767 (4th Cir.2006). *See also Long v. Silver, supra,* 248 F.3d at 316–17 (same).

Here, the broad language of the Agreement made it clear that Falls's claim for a bonus must be submitted to arbitration. After all, if the Agreement had not existed, Falls clearly would have had no right to receive a bonus. In other words, Falls's right to receive an incentive bonus arose directly out of the Agreement and, as previously stated, Falls and 1CI agreed to submit to a single arbitrator any "dispute, claim, or controversy arising out of or relating to" the Agreement. We therefore hold that the "controversy" as to whether appellant was entitled to a bonus and the amount of that bonus must be arbitrated in accordance with paragraph 10b of the Agreement.

In support of his position that the agreement to arbitrate did not encompass claims made under the MWPCL, Falls cites three unreported opinions by Maryland federal district court judges. None of these opinions constitutes persuasive authority, however, because the opinions are unreported: *See Kendall v. Howard County,* 204 Md.App. 440, 445, n. 1, 41 A.3d 727 (2012), *cert.* granted 427 Md. 606, 50 A.3d 606 (2012). In *Kendall* we said:

> Under Rule 32.1(a) of the Federal Rules of Appellate Procedure, after January 1, 2007, a United States Court of

Appeals may not prohibit a party from citing an unpublished opinion of a federal court for its persuasive value or any other reason. However, it is the policy of this Court in its opinions not to cite for persuasive value any unreported federal or state court opinion. In this case, our policy is not implicated because we have cited the two unreported federal case opinions only to impart the history of this case.

But even if all the decisions appellant relies upon were reported, none of them is apposite because the opinions deal with forum selection clauses—not arbitration clauses.

Falls argues, citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 483, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), which quotes *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), that arbitration agreements are "in effect, a specialized kind of forum-selection clauses." While it is true that arbitration clauses are a specialized kind of forum selection clause, cases interpreting the scope of forum-selection clauses are not persuasive when interpreting an agreement to arbitrate. This was explained in *Spring Hope Rockwool, Inc. v. Industrial Clean Air, Inc.*, 504 F.Supp. 1385, 1389 (E.D.N.C.1981) where the Court said:

> Plaintiff seeks to rely on *The Bremen v. Zapata Off–Shore Company,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). In *The Bremen,* however, the Supreme Court addressed a contractual provision which chose a forum for litigation, not for arbitration. While the two types of provisions are quite similar and while courts enforce both in the absence of extraordinary circumstances, *an arbitration provision has the additional force of the Congressional imprimatur found in Section 2 of the Arbitration Act.* Under Section 2, the arbitration provision must be enforced unless the party seeking to avoid arbitration can prove that the arbitration clause itself *was voidable for fraud, coercion, or "such grounds as exist at* law or in equity for the revocation of any contract." In *Sam Reisfeld & Son Import Company v. S.A. Eteco,* 530 F.2d 679 (5th Cir.1976), plaintiff sought to avoid arbitration in the forum chosen in a contractual provi-

> sion by arguing that under *The Bremen,* the forum was unreasonable. The Fifth Circuit held that plaintiff's "attack *falters on its initial premise that The Bremen* unreasonableness test is *applicable to arbitration clauses.* Rather, we agree with the district court that the enforceability of the arbitration clause at issue is governed exclusively by the explicit provisions of the Federal Arbitration Act."

(emphasis added).

For the reasons stated above, we hold that: 1) the mere fact that Falls's complaint raises a statutory claim under the MWPCL, rather than a breach of contract claim, does not support Falls's assertion that arbitration should have been denied; and 2) in this case, paragraph 10b of the agreement was broad enough to encompass the claim asserted by Falls in his one-count Complaint.

**B. *Other arguments as to the scope of paragraph 10B.***

Falls also asserts:

> [T]he clause in this case mandates that Alaska law [shall] apply, which triggers the same policy concerns present in *Schultz* [*v. All–Fund, Inc.*—one of the unreported cases relied upon by appellant] because Alaska's remedies for wage payment violations fall short of the protections Maryland provides its citizens. As discussed above, Maryland's wage payment law provides for up to treble damages. By contrast, Alaska's wage payment law only provides for up to double damages. *See AS* § 23.10.110. Mr. Falls, like the plaintiff in *Schultz*, stands to lose his Maryland statutory claim and remedies if the arbitration clause is enforced and Appellees are allowed to shirk their obligations under Maryland law. In short, . . . the arbitration clause is inapplicable and should not be enforced.

There is no merit in this argument. For starters, the arbitration clause [paragraph 10b in the Agreement] *does not* mention choice of law. The provision of the Agreement dealing with what law should be applied is set forth in paragraph 10a. Therefore, whether the subject case were to

be tried by a Maryland court or an arbitrator in Seattle, the choice of law provision set forth in paragraph 10a would have to be addressed. In other words, the fact that the contract containing an arbitration clause also contained separate choice of law provisions has nothing whatsoever to do with whether the agreement to arbitrate should be enforced as written.

Restatement (Second) of Conflicts of Law, § 187 provides:

§ 187 Law of the State Chosen by the Parties

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Under Alaska law, when issues of conflict of law arise, Alaska courts apply the provisions of Restatement (Second) of Conflicts of Law. *See Palmer G. Lewis Co., Inc. v. ARCO Chemical Company,* 904 P.2d 1221, 1227 (Alaska, 1995) (when choice of law issues arise, Alaska generally looks to the Restatement (Second) of Conflicts)). Maryland does likewise. *See Jackson v. Pasadena Receivables,* 398 Md. 611, 617, 921

A.2d 799 (2007) (applying Restatement (Second), § 187(1) and (2).

In this case, the issue of what law governs Falls's substantive rights, when § 187 of Restatement (Second) Conflicts of law is applied, will probably turn on the issue of whether application of Alaskan law would be contrary to a *fundamental policy* of Maryland.[7] Recently, the Fourth Circuit Court of Appeals, in *Kunda v. C.R. Bard, Inc.*, 671 F.3d 464 (4th Cir.2011) made an attempt to forecast how a Maryland appellate court would rule if it were confronted with the issue of whether the rights enunciated in the MWPCL constituted a fundamental policy of Maryland. The *Kunda* Court opined that the rights set forth in the MWPCL *do not* embody a fundamental policy of Maryland. *Id.*

By contrast, the Supreme Judicial Court of Massachusetts, in a somewhat similar case, ruled that the Massachusetts Wage Act *did* embody a fundamental policy of Massachusetts law, and therefore the forum selected by the parties to try the case (New York State) would apply Massachusetts law. *Melia v. Zenhire, Inc.*, 462 Mass. 164, 967 N.E.2d 580, 594–95 (2012). We will not, however, decide the issue of whether the rights enunciated in the MWPCL constitute a fundamental policy of Maryland law because that issue was never raised or decided below, nor has it been briefed in this court by the parties. *See* Md. Rule 8–131(a) (except for issues of jurisdiction, Maryland appellate courts ordinarily will not decide any other issue neither raised or decided below).

---

7. It would appear that the State of Alaska does have a "substantial relationship to the parties." *Falls* was the CEO of 1CI, which was the wholly owned subsidiary of Cape Fox, an Alaska Corporation. Cape Fox's principal place of business is in Saxman, Alaska. Comment 6 to Restatement (Second) of Conflicts of Law, § 187 states: "when the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when this state is ... where one of the parties is domiciled or has his principal place of business."

### III.

### *Was the Agreement to arbitrate unconscionable*[8] *because it called for the arbitration to take place in Seattle, Washington?*

In attempting to show that the agreement to arbitrate was unconscionable, Falls relies on either Maryland cases or on federal decisions interpreting the FAA. More specifically, he does not contend that Alaska law differs from either the federal or Maryland law in regards to unconscionability. Therefore, Falls will be deemed to have waived, for purposes of this appeal, any contention that Alaska law differs in that regard. See note 5, *supra.*[9]

The seminal case in Maryland dealing with the question of whether a contractual provision to arbitrate is unconscionable is *Walther, supra.*

In *Walther,* the Court said:

An unconscionable bargain or contract has been defined as one characterized by "extreme unfairness," which is made

---

8. The Supreme Court has said that the issue of unconscionability is a contract defense that may be raised under state law, and that application of state contract law is consistent with the Federal Arbitration Act. *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). The principle that state law governs issues of whether an arbitration clause is unconscionable was thoroughly discussed in the case of *Stutler v. T.K. Constructors, Inc.* 448 F.3d 343, 346 (6th Cir.2006). In *Stutler,* a district court judge applied federal common law rather than Kentucky law in a diversity case involving the issue of whether the contract to arbitrate was unconscionable. The district court, in *Stutler* denied the defendant's motion to stay the proceeding pending arbitration because arbitration costs would be "prohibitively expensive." *Id.* at 344. The Sixth Circuit reversed and remanded the case with instructions to apply Kentucky law. *Id.* at 345–47.

9. In the Circuit Court, Falls ignored Alaska's law when discussing unconscionability. Md.Code (2008 Repl.Vol.) § 10–504 of the Courts and Judicial Proceedings Article provides:

> § 10–504. Evidence of laws. A party may also present to the trial court any admissible evidence of foreign laws, but to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken of it, reasonable notice shall be given to the adverse parties in the pleadings or by other written notice.

evident by "(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party." BLACK'S LAW DICTIONARY 1560 (8th ed.2004). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. b (1981) (observing that, "[t]raditionally, a bargain was said to be unconscionable in an action at law if it was 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other' ") (citation omitted). One of the leading treatises on the law of contracts describes what is meant by unconscionability:

> The concept of unconscionability was meant to counter act two generic forms of abuses: the first of which relates to procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter the transaction; and the second of which relates to the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having nothing to do with price or other central aspects of the transaction.

8. Richard A. Lord, *Williston on Contracts* § 18:10 (4th ed.1998). The United States Court of Appeals for the Fourth Circuit also explained the particular characteristics of both procedural and substantive unconscionability in *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), stating:

> Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief (for

> instance, "I have the right to cut off one of your child's fingers for each day you are in default"), while procedural unconscionability deals with the process of making a contract—"bargaining naughtiness" (for instance, "Just sign here; the small print on the back is only our standard form"). Each of these branches of unconscionability has common-law cousins; procedural unconscionability looks much like fraud or duress in contract formation, and substantive unconscionability reminds us of contracts or clauses contrary to public policy or illegal.
>
> *Id.* at 296 n. 12 [872 A.2d 735] (quoting James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 4-3, at 186 (3d ed.1988)). *See also Harris v. Green Tree Financial Corp.,* 183 F.3d 173, 181 (3d Cir.1999) (referring to "procedural unconscionability" as "the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language" and "substantive unconscionability" as "contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent").

*Id.*

In deciding whether the arbitration clause in Falls's contract of employment is unconscionable, it is important to distinguish Falls's contract from pre-employment contracts that many employees are required to sign if they wish to work for an employer. This distinction was discussed recently in a comment entitled *"Customizing Employment Arbitration,"* by O'Connor, Martin, and Thomas, 98 Iowa Law Review 133 (2012). In that law review article, the authors studied the employment contracts of 910 randomly selected Chief Executive Officers of California corporations. *Id.* at 133. The authors said:

> [O]ur study of CEO employment contracts provides a unique opportunity to revisit arguments about some common practices related to arbitration between employers and employees. *Employment arbitration is controversial in the United States. Although employment arbitration promises*

*a quicker, cheaper, and less adversary means for employees to resolve their disputes with employers, critics charge that the arbitration agreements are contracts of adhesion, that the employment arbitration system is rigged in favor of employers, and that employers utilize arbitration to effectively deprive employees of their rights.*

Given the concerns about the fairness of employment arbitration, governments and arbitration associations have responded in several different ways. Particularly relevant to this Article, *many U.S. state courts use the contract law doctrine of unconscionability to scrutinize the terms of arbitration clauses in employment contracts for fundamental fairness.* In the context of arbitration carveouts, a number of U.S. courts will strike an arbitration clause as unconscionable if it forces only the employee to arbitrate her claims, while still preserving the employer's right to enforce its rights in court. In California, state courts have struck down arbitration clauses that on their face require both parties to bring their claims to arbitration but then carve out from arbitration claims that are likely to be brought by the employer. Given that California is often a leader in state efforts to regulate unfair arbitration provisions, its stance on this issue could well spread to other states.

*Our CEO employment contracts provide a window into the terms of employment agreements where both parties have significant bargaining power and actively negotiate their agreements with the assistance of counsel. These agreements are admittedly very different from the adhesion contracts typically found in employment, but the very fact that our contracts are negotiated can provide some indication of whether sophisticated employees think arbitration disserves their interests.* In our contracts, the terms that survive mutual negotiation likely are not the product of employer overreaching, but rather reflect the strong economic desire of one of the parties to obtain a legal right even if it means that the party must provide extra compensation, or alternate concessions, in order to obtain the right. This suggests that if we find that the parties commonly

> agree to certain arbitration provisions, these provisions must be the result of an efficient bargain between them. Such findings may have implications for the enforceability of similar provisions in other employment contracts; if even sophisticated employees are comfortable accepting these terms, then perhaps courts should reconsider their hostility to such contract clauses. Along these lines, *our first important finding is that about half of the CEO employment agreements provide for the arbitration of disputes*, and that the use of arbitration clauses is increasing significantly over time. *Our finding suggests that the use of arbitration in the context of employment provides significant legitimate benefit to one or both parties, at least for sophisticated parties.*

*Id.* (Emphasis added).

The Agreement here at issue dealt with a CEO who signed the contract after he was employed. Like the contracts studied by the authors of the Iowa Law Review Article, the contract was negotiated by the parties before Falls signed it, and Falls, although not represented by counsel, was obviously a "sophisticated employee [ ]." The Agreement did not in any way constitute a contract of adhesion.

Falls does not allege that the agreement to arbitrate was procedurally unconscionable. He claims, instead, that the arbitration clause was substantively unconscionable because, *inter alia,* the place of the arbitration was to be Seattle, Washington. Falls argues:

> Seattle, Washington has no interest in adjudicating this dispute, and has no ties to either party. Moreover, it would be extremely inconvenient, burdensome, and unreasonable for Mr. Falls, a now-unemployed individual, to have to travel to the opposite side of the country to pursue recovery on his claims—particularly when Appellees both have counsel in the Washington, D.C. area that regularly represent their interests locally.

(Emphasis added).

Two of the grounds relied upon by Falls, which we have underlined in the above quote, are not supported by the

record. In the Circuit Court, there was no proof proffered by Falls showing that he was "now unemployed." Nor was it shown that the appellees have "counsel in the Washington, D.C. area that regularly represents their interests locally."

Here, the situs of the arbitration was evidently chosen because Seattle, Washington is the nearest major city [in the lower forty-eight states] to Saxman, Alaska, which is the place where Cape Fox has its principal place of business. No proof was presented in the Circuit Court as to how expensive it would be for appellant to travel to Seattle, or to stay there for the arbitration hearing.[10]

Falls argues that it would be more expensive for him to arbitrate his claim in Seattle than to try the case in a Maryland Court. In other words, he claims that the State of Washington is an inconvenient place to litigate this matter. But, when deciding whether an agreement to arbitrate is substantively unconscionable, the *forum non conveniens* doctrine is inapplicable. *See Spring Hope Rockwool, Inc. v. Industrial Clean Air, Inc., supra,* 504 F.Supp. at 1389–90.

Based on the record, we see nothing unconscionable in the agreement to arbitrate in Seattle. Falls made no showing in the Circuit Court that the provision dealing with the place of arbitration was "unreasonably or grossly favorable" to 1CI. *Walther, supra,* 386 Md. at 427, 872 A.2d 735. If Falls had any problems with the site chosen for arbitration, he should have refused to sign the employment contract. He had bargaining power in this regard inasmuch as the Agreement was the product of negotiation and, at the time the Agreement was signed, his employers obviously wanted Falls to run 1CI. Moreover, there is no indication in the record that Falls could

---

**10.** In claiming that the place of the agreement to arbitrate was substantively unconscionable, Falls cites only one unreported federal case. That case is inapposite because it did not deal with an arbitration clause; instead it dealt with a forum selection clause. The two clauses are materially different. *See Spring Hope Rockwool, Inc., supra,* 504 F.Supp. at 1389–90.

not afford to prosecute his million dollar claim before a JAMS arbitrator in Seattle.

## IV.

### *Is the arbitration clause unconscionable because it required that the parties split the arbiter's fees?*

In arguing the issues of whether Fall's agreement to pay 50% of the arbitrator's fee made the arbitration claim unconscionable, both parties rely exclusively on federal cases. Falls accurately cites two federal cases that have adopted a *per se* rule and held that any arbitration clause that requires that the cost of arbitration be paid 50% by the employee and 50% by the employer is unconscionable as a matter of law. *See Shankle v. B–G Maintenance Mgmt. of Colorado, Inc.,* 163 F.3d 1230 (10th Cir.1999) and *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165 (9th Cir.2003). But, as appellees point out, numerous courts, applying federal common law, have taken a contrary view.

One case relied upon by the appellees is *Bradford v. Rockwell Semiconductor Systems, Inc.,* 238 F.3d 549 (4th Cir.2001). That case concerned a claim under the Age Discrimination and Employment Act. Bradford sued his employer and complained that the fee-splitting provision of the agreement to arbitrate made the arbitration clause unconscionable. The *Bradford* Court, relying, *inter alia,* on *Williams v. Cigna Financial Advisors, Inc.,* 197 F.3d 752, 763–64 (5th Cir.1999) and *Green Tree Financial Corp.–Alabama v. Randolph,* 531 U.S. 79, 92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), rejected the *per se* approach and adopted, instead, a case-by-case approach. The *Bradford* Court said:

> We agree with *Williams* that the crucial inquiry under *Gilmer* is whether the particular claimant has an adequate and accessible substitute forum in which to resolve his statutory rights and that *Gilmer* does not call for the conclusion that fee splitting, in all cases, deprives the claimant of such a forum. *We believe that the appropriate*

*inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation,* i.e., *a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court,* and *whether that cost differential is so substantial as to deter the bringing of claims. See Williams,* 197 F.3d at 764 (focusing upon the inability to pay; whether the forum fees created a prohibitive expense; whether Williams had a full opportunity to vindicate his claims; and whether the forum fees prevented the arbitral forum from providing an adequate substitute for the judicial forum); *Rosenberg,* 170 F.3d at 16 (focusing in part upon the cost differential between arbitration and litigation); *Shankle,* 163 F.3d at 1235 & n. 4 (focusing in part on the fact that Shankle and similarly situated employees could not afford the fee and rejecting argument that fee-shifting provision mitigated the burden because "the Agreement does not actually shift responsibility for payment of fees based on ability to pay"). Although the *Cole* [*v. Burns International Security Services,* 105 F.3d 1465 (D.C.Cir. 1997) ] court framed its concern with fee-splitting partially in terms of the fact that arbitrator's fees are "unlike anything that [a claimant] would have to pay to pursue his statutory claims in court" because a claimant normally "would be free to pursue his claims in court without having to pay for the services of a judge," *Cole,* 105 F.3d at 1484–85. we believe that the proper inquiry under *Gilmer* is not where the money goes but rather the amount of money that ultimately will be paid by the claimant. Indeed, *we fail to see how a claimant could be deterred from pursuing his statutory rights in arbitration simply by the fact that his fees would be paid to the arbitrator where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court.*

Our conclusion that the proper inquiry is a case-by-case analysis rather than a per se rule is bolstered by the Supreme Court's recent decision in *Green Tree Financial Corp.–Alabama v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148

L.Ed.2d 373 (2000). In *Green Tree,* the Court addressed "whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." 121 S.Ct. at 517. In resolving this question, the Court recognized that "it may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." *Id.* at 522. The Court noted, however, that "*the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter.*" *Id.* Accordingly, the Court stated that

> the record reveals only the arbitration agreement's silence on the subject, and that act alone is plainly insufficient to render it unenforceable. *The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement. To invalidate the agreement on that basis would undermine the liberal federal policy favoring arbitration agreements.* It would also conflict with our prior holdings that the party resisting arbitration bars the burden of proving that the claims at issue are unsuitable for arbitration.

*Id.* (internal quotation marks and citations omitted and emphasis added). The Court further stated that "we have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden." *Id.* (internal citations omitted). In other words, the *Green Tree* Court rejected Randolph's argument because Randolph could not satisfy her burden of establishing that she was likely to incur prohibitive costs that would deter her from arbitrating her claims. We believe that the *Green Tree* Court's focus on *each individu-*

> *al claimant's "burden of proving that the claims at issue are unsuitable for arbitration," its emphasis on Randolph's inability to show that she was in fact* likely to incur prohibitive costs, and its refusal to nullify the arbitration agreement based upon an abstract and speculative risk that the claimant might under some circumstances, incur prohibitive costs undermines the rationale of those courts that would impose a per se prohibition against an arbitration provision that might impose prohibitive costs against an individual on the theory that any such risk of prohibitive costs, even if that risk is entirely uncertain, surely deters the bringing of arbitration.
>
> Although *Green Tree* involved a slightly different fact situation than the present case because it involved an arbitration agreement that remained silent on the issue of costs as opposed to explicitly requiring fee-splitting, we believe that it is nevertheless instructive because it clearly analyzed the issue before it—whether the possibility of fees splitting precludes a litigant from effectively vindicating her federal statutory rights in the arbitral forum—in terms of the individual litigant and the arbitration agreement before it, rather than in terms of a broad per se rule that would nullify or invalidate an entire category of arbitration provisions. Notably, the *Green Tree* Court suggested that some showing of individualized prohibitive expense would be necessary to invalidate an arbitration agreement on the ground that fee splitting would be prohibitively expensive, although it did not decide that issue. *See* 121 S.Ct. at 522–23 ("How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss. . . ."). We believe that the *Green Tree* Court's focus on Randolph's individualized costs and, by inference, the individualized deterrent effect arising from those costs, cautions against adopting the broad per se rule sought by Bradford.

*Id.* at 556–557 (Footnotes omitted, emphasis added).

Since 2000, when *Green Tree* was decided by the Supreme Court, *all* United States Federal Circuit Courts have adopted

the same case-by-case approach as described in *Bradford* when interpreting the FAA. *See D'Antuono v. Serv. Rd. Corp.,* 789 F.Supp.2d, 308, 334 (D.Conn.2011) (collecting cases).

*Ingle, supra,* which Falls relies upon, was decided after *Green Tree,* but it interpreted California law, which applies a *per se* unconscionability rule when an employment contract calls for the employer and employee to evenly split the arbitrator's fee, 328 F.3d at 1165, 1178–1181. In *Ingle,* all employees who wished to work for the defendant, Circuit City, as a condition to employment, had to sign a contract requiring arbitration by employees of "all employment-related claims." *Id.* at 1170. California law, rather than the federal common law as set forth in *Green Tree,* was applicable because the *Ingle* Court was exercising diversity jurisdiction and was required to apply California law, not the federal common law. *See,* n. 8, *supra.*

The decision by the Supreme Court in *Green Tree* is not binding on us, nor are the decisions of the United States Circuit Courts that have used the case-by-case approach espoused in *Green Tree.* Nevertheless, the rationale for a case-by-case approach as outlined in *Green Tree* and fully explained in *Bradford,* is persuasive to us. We therefore hold that under Maryland law, a contractual provision that requires the parties to split the arbitration fee is not *per se* unconscionable; instead, a case-by-case analysis must be made to determine whether the agreement to divide the cost of the arbitration would make arbitration prohibitively expensive. The party opposing arbitration has the burden of proving that fee-splitting would make arbitration prohibitively expensive.

We recognize, of course, that fee-splitting clauses may be unconscionable under some circumstances. But this case provides a perfect example as to why the *per se* unconscionably approach should be rejected. Falls is a sophisticated business executive who personally negotiated the contract that contained the arbitration clause. The agreement to arbitrate specified that the dispute would be decided by the arbitrator within 90 days, unless the parties mutually agreed otherwise.

This meant that his claim would be decided far quicker than it could be decided if he were forced to try his case in court. Also, the arbitration clause allowed Falls to collect attorney's fees if he prevailed. In most situations, he would have had no such right if the contract had been silent in this regard.[11] And lastly, while it is true that arbitration can be expensive, litigation in court might very well be far more expensive.

In the trial court, Falls introduced no affidavit or other proof concerning his financial status, nor did he provide the court with *any* proof showing that arbitration was likely to be more expensive than litigation. Applying the case-by-case approach, we therefore hold that Falls did not meet his burden of presenting evidence showing that the fee split provision was unconscionable.

## V.

***Is the arbitration clause in the agreement unconscionable because it prohibits an appeal?***

As previously mentioned, the arbitration clause provides that the arbitration award is "final, binding, and non-appealable" (hereinafter, the "non-appealable" clause). Alaska, Maryland and the FAA all provide for vacatur of arbitration awards under certain limited circumstances. The Alaska and Maryland statutes are modeled after the FAA, and both give the same rights to seek a vacatur as are set forth in the FAA in 9 USC § 10.

Appellant argues:

> Since the arbitration clause specifies that Alaska law applies, the requirement that the arbitration award be "nonappealable" is unconscionable because it contravenes Alaska law on its face. Under the Alaska Uniform Arbitration Act,

---

11. We recognize of course that even without the language in the Agreement concerning attorney fees *Falls* would have a right to attorney fees under the MWPCL if he were the prevailing party. The broad arbitration clause, however, potentially covered many other types of claims, *i.e.*, any dispute arising out of or related to the Agreement.

any party to an arbitration has the right to seek to vacate or modify the final award. AS § 09.43.500, § 09.43.510. The parties may not waive these codified rights by contract or otherwise. AS § 09.43.310(c).

In Falls's reply brief, he states:

[T]o the extent that the "nonappealable" provision of the arbitration clause purports to foreclose a party's entitlement under the FAA or any applicable state analogue, to seek review or vacation of an arbitral award or decision, such provision renders the clause unconscionable and unenforceable. At a minimum, the offending provision should be stricken from the arbitration clause pursuant to Section 10(h) of the employment agreement.

Whether Falls's argument has merit depends on the validity of his assumption that the terms "final," "binding," and "non-appealable" mean that he could not move to vacate the award in accordance with Alaska law in the event that the arbitrator's award was adverse to him. If Falls's interpretation of those terms is valid, the "non-appealable clause" would be unconscionable. *See Bay Networks Group, Inc. v. Willemijn, B.V.*, 20 F.Supp.2d. 626, 628 n. 1 (S.D.N.Y.1998). *See also* 1 Domke on Commercial Arbitration § 33.01. ("The right to an appeal from an award, though restricted in the statutory laws of many states may not be waived by stipulation of the parties"). But courts uniformly, as far as we have been able to determine, have not interpreted the phrases "binding," "final," or non-appealable" to mean that a losing party cannot move to vacate an award on grounds allowed by statute.

The leading case in this regard is *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir.1992). In the *Avco* case, the appellant argued that the federal court had no jurisdiction to hear the case because the parties agreed that the arbitrator's award was "final" and that the parties waived their right to appeal. The court held that the terms "final" and "binding," as used in an arbitration agreement, simply "reflect contractual intent that the issue joined and resolved in the arbitration may not be tried *de novo* in any court."

Therefore, the court held, such provisions do not foreclose the losing party from exercising his/her right to seek vacatur of the award as permitted by statute. *Id.* at 145. *See also International Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 86 (2d Cir.1996) (same); *M & C Corp. v. Erwin Behr GmbH & Co.,* 87 F.3d 844, 847 (6th Cir.1996) (same); *DDI Seamless Cylinder Int'l, Inc. v. General Fire Extinguisher Corp.,* 14 F.3d 1163, 1166 (7th Cir.1994) (same). *Brotherhood of R.R. Trainmen v. Central of Ga. Ry. Co.,* 415 F.2d 403, 412 (5th Cir.1969) (" 'Finality' " is a mirage if relied upon to preclude *any* judicial review of an arbitration award or administrative agency's decision"); *Gramling v. Food Machinery & Chemical Corp.,* 151 F.Supp. 853, 855 (W.D.S.C.1957) (where arbitration contract provides that an award shall be binding on parties without any right of appeal, motion for vacatur or to modify is only remedy); Article: *Arbitration Post Award Procedures,* 60 Ala. Law Review 314, 316 (1999) by William Hardie ("Frequently, an arbitration agreement will contain language that the arbitrator's award is 'final,' 'binding' and 'non-appealable.' Such language does not, however, bar review and vacatur for the grounds recognized under the FAA"). We find the federal cases interpreting "non-appealable" clauses similar to that used in this case persuasive. We therefore hold that the Agreement does not bar a petition to vacate, as permitted by Alaskan law.[12] Accordingly, the trial judge did not err in failing to find the arbitration clause unconscionable on that ground.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

12. Appellant has cited no case, and we have found none, where a court in any jurisdiction has interpreted a "non-appealable clause" to mean that the losing party cannot use the procedure for vacating an arbitrator's award that is allowed by statute.